Present:  Carrico, C.J., Compton, Hassell, Keenan, Koontz,
          and Kinser, JJ., and Poff, Senior Justice

KARL B. PULLIAM, EXECUTOR OF THE
ESTATE OF ELNORA R. PULLIAM
                                        OPINION BY
v.  Record No. 980659          CHIEF JUSTICE HARRY L. CARRICO
                                       January 8, 1999
COASTAL EMERGENCY SERVICES
OF RICHMOND, INC., ET AL.

            FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
                      James F. D'Alton, Jr., Judge

      In this appeal, we are called upon to consider again

the constitutionality of the medical malpractice cap

imposed by Code § 8.01-581.15.[1]  We previously upheld the

constitutionality of the cap in Etheridge v. Medical Center

Hospitals, 237 Va. 87, 376 S.E.2d 525 (1989).  Two other

issues involving the cap become pertinent if we reaffirm

Etheridge.  Because we conclude that the medical

malpractice cap does not violate any constitutional

guarantees, we will uphold the cap's constitutionality and

reaffirm Etheridge.

      In a motion for judgment filed below, the plaintiff,

Karl B. Pulliam, Executor of the Estate of Elnora R.

Pulliam, sought damages of $2,000,000 from the defendants,

Coastal Emergency Services of Richmond, Inc. (Coastal) and

---

[1]Code § 8.01-581.15 provides that "[i]n any verdict returned
against a health care provider in an action for
malpractice[,] . . . the total amount recoverable for any

its agent, Dr. Thomas Anthony DiGiovanna (Dr. DiGiovanna), for his alleged negligence in the death of Mrs. Pulliam.[2] The jury returned a verdict in favor of the plaintiff against both defendants in the sum of $2,045,000, plus interest from the date of Mrs. Pulliam's death.

Upon motion of the defendants, the trial court reduced the verdict to $2,000,000, the amount sued for, and, applying the medical malpractice cap, further reduced the verdict to $1,000,000 and entered judgment against both defendants in that amount. Holding that prejudgment interest is subject to the cap, the trial court disallowed the jury's award of interest running from the date of Mrs. Pulliam's death. We awarded the plaintiff this appeal.

The record shows that Coastal was created to provide emergency physicians to staff emergency departments in hospitals and that it contracts with hospitals for this purpose. On October 27, 1989, Coastal contracted with Southside Regional Medical Center (Southside Regional) in Petersburg to provide "at least five Physicians . . . to render professional and administrative services in [Southside's Emergency] Department on a full-time basis."

---

injury to, or death of, a patient shall not exceed one million dollars."
[2] It is a concession in the case that Coastal "is liable in respondeat superior" for the negligence of Dr. DiGiovanna.

2

Coastal recruits doctors to work in emergency departments "from a number of avenues." On October 12, 1994, Coastal contracted with Dr. DiGiovanna "to provide services on and during the days and hours scheduled by [Coastal]" and assigned him to Southside Regional.

The record shows further that about 3:55 a.m. on December 15, 1995, Mrs. Pulliam arrived at the emergency room of Southside Regional complaining of "legs aching." She had been diagnosed with influenza two days earlier in the office of her private physician. At Southside Regional, she was examined by Dr. DiGiovanna. About 5:00 a.m., Dr. DiGiovanna discharged Mrs. Pulliam after prescribing a muscle relaxant and giving her printed instructions on influenza and additional instructions concerning bed rest.

Shortly after 11:00 a.m. the same day, Mrs. Pulliam returned to the emergency room of Southside Regional complaining of general weakness, particularly in her lower extremities. Following a physical examination by Dr. Boyd Roy Wickizer, Jr., Mrs. Pulliam was started on intravenous fluids and subjected to a CT scan and a lumbar puncture.[3] Thereafter, she was transferred to the intensive care unit,

---

[3] Dr. Wickizer was named originally as a defendant to the plaintiff's motion for judgment but was later nonsuited.

where her condition worsened.  She was pronounced dead at 9:08 p.m.  An autopsy revealed that the cause of death was bacterial pneumonia and bacteremia.  She was survived by her husband, who is the executor of her estate, and a son.

### A.  Constitutionality of Medical Malpractice Cap.

The plaintiff's assignment of error on this point states that "[a]s a matter of law, the trial court erred in failing to conclude that the cap on medical malpractice awards is unconstitutional as applied to Coastal and to Dr. DiGiovanna."[4]  In considering this assignment of error,

> we adhere to the well-settled principle that all actions of the General Assembly are presumed to be constitutional.  This Court, therefore, will resolve any reasonable doubt regarding a statute's constitutionality in favor of its validity.  Any judgment as to the wisdom and propriety of a statute is within the legislative prerogative, and this Court will declare the legislative judgment null and void only when the statute is plainly repugnant to some provision of the state or federal constitution.

Supinger v. Stakes, 255 Va. 198, 202, 495 S.E.2d 813, 815 (1998) (citations and interior quotation marks omitted).

---

[4] We emphasize the "as applied" language of the plaintiff's assignment of error because, in oral argument, the plaintiff contended that legislation adopted in 1994 adding entities like Coastal to the definition of "[h]ealth care provider" was facially invalid, and the assignment of error does not permit that argument.  Rule 5:17(c).  Furthermore, the argument is foreclosed because it was not made in the trial court, in the plaintiff's petition for appeal, or in his appellate briefs.  Rule 5:25.

In *Etheridge*, we rejected challenges to the constitutionality of the medical malpractice cap based upon contentions that the cap "violates the Virginia Constitution's due process guarantee, jury trial guarantee, separation of powers doctrine, prohibitions against special legislation, and equal protection guarantee, as well as certain parallel provisions of the Federal Constitution." 237 Va. at 92, 376 S.E.2d at 527. The plaintiff makes the same challenges here, but amplifies the arguments in several respects.[5]

It is clear that we cannot grant the plaintiff relief without overruling *Etheridge*. Immediately, therefore, the doctrine of *stare* *decisis* is implicated.

> In Virginia, the doctrine of stare decisis is more than a mere cliche. That doctrine plays a significant role in the orderly administration of justice by assuring consistent, predictable, and balanced application of legal principles. And when a court of last resort has established a precedent, after full deliberation upon the issue by the court, the precedent will not be treated lightly or ignored, in the absence of flagrant error or mistake.

*Selected Risks Ins. Co. v. Dean*, 233 Va. 260, 265, 355 S.E.2d 579, 581 (1987) (emphasis added).

---

[5] On brief, the plaintiff argues a claim not asserted in *Etheridge*, *i.e.*, that the cap "does not express its object in its title [in violation of art. IV, § 12 of the Constitution of Virginia]." However, the plaintiff did not raise this point in the trial court or in the petition for appeal, and we will not consider it now. Rule 5:25.

The inquiry becomes, therefore, whether flagrant error or mistake exists in the Etheridge decision. The plaintiff contends that such error does exist and, therefore, that "[t]he doctrine of stare decisis should not deter this Court from reversing Etheridge."

The plaintiff argues that the medical malpractice cap is unconstitutional on each of seven independent grounds. We will consider these grounds seriatim.

### 1. Right to Trial by Jury.

Article I, § 11 of the Constitution of Virginia provides "[t]hat in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred." In Etheridge, we noted that, at the time the Constitution was adopted, the jury's sole function was to resolve disputed facts, that this continues to be a jury's sole function,[6] and that the jury's fact-finding function extends to the assessment of damages. 237 Va. at 95-96, 376 S.E.2d at 529. We stated, however, that "[o]nce the jury has ascertained the facts and assessed the damages, . . . the constitutional mandate is satisfied [and thereafter], it is the duty of

---

[6]In Speet v. Bacaj, 237 Va. 290, 296, 377 S.E.2d 397, 400 (1989), and Supinger v. Stakes, 255 Va. 198, 205, 495 S.E.2d 813, 815 (1998), we reaffirmed the proposition that

6

the court to apply the law to the facts."  Id. at 96, 376

S.E.2d at 529.  The medical malpractice cap, we said, does

nothing more than establish the outer limits of a remedy;

remedy is a matter of law and not of fact; and a trial

court applies the remedy's limitation only after the jury

has fulfilled its fact-finding function.  Id.  Hence, we

concluded, the cap does not infringe upon the right to a

jury trial.  Id. at 97, 376 S.E.2d at 529.[7]

<hr />

a jury's sole common law function is to resolve disputed
facts.

[7] The plaintiff criticizes the Etheridge majority for its
interpretation of the opinion in W.S. Forbes & Co. v.
Southern Cotton Oil Co., 130 Va. 245, 108 S.E. 15 (1921).
The plaintiff says that "the linchpin of the reasoning of
the Etheridge majority [concerning trial by jury] was a
statement in [Forbes], taken out of context and given a
broad meaning never intended by the Forbes court."  This is
the statement in Forbes the plaintiff cites:  "The province
of the jury is to settle questions of fact, and when the
facts are ascertained the law determines the rights of the
parties.  This law is announced by the court or judge."
130 Va. at 260, 108 S.E. at 20.  However, in the same
paragraph, the Forbes court also said this:  "If no . . .
evidence is offered . . . that would warrant a jury . . .
in finding a verdict in accordance therewith, then the
rights of the parties become a question of law, and there
is no controversy to be determined by a jury, and the
constitutional guaranty does not apply."  Id. at 261, 108
S.E. at 20 (emphasis added).  This is the conclusion we
drew in Etheridge that attracted the plaintiff's criticism:
"Once the jury has ascertained the facts and assessed the
damages, . . . the constitutional mandate is satisfied.
Thereafter, it is the duty of the court to apply the law to
the facts."  Etheridge, 237 Va. at 96, 376 S.E.2d at 529
(citations omitted).  We think this conclusion was fully
justified, and we reaffirm it.

7

The plaintiff says, however, that the Court in Etheridge "erred by failing to conclude that the mandate of Article I, § 11 includes the right to receive the amount of damages awarded by a jury after a proper jury trial."  In this connection, the plaintiff cites two recent Supreme Court decisions.

In Hetzel v. Prince William County, ___ U.S. ___, 118 S.Ct. 1210 (1998), the United States Court of Appeals for the Fourth Circuit set aside as grossly excessive a jury verdict for damages the plaintiff had been awarded in district court.  The Fourth Circuit remanded the case for recalculation of the award and the entry of judgment for a lesser amount.  The district court granted the plaintiff's motion for a new trial.  The Fourth Circuit then granted the defendant's petition for mandamus and stayed the scheduled retrial.  The Supreme Court reversed, holding that the Fourth Circuit had imposed a remittitur without the option of a new trial and that this action "cannot be squared with the Seventh Amendment."  ___ U.S. at ___, 118 S.Ct. at 1212.

Feltner v. Columbia Pictures Television, Inc., ___ U.S. ___, 118 S.Ct. 1279 (1998), involved an action by Columbia, a copyright owner, against Feltner, the owner of television stations that continued to broadcast programs

8

after Columbia terminated their licenses. A statute gave Columbia the option of seeking actual damages or statutory damages, the latter permitted in an amount "as the court considers just." ___ U.S. at ___, 118 S.Ct. at 1282. Columbia chose the statutory route and made a request for a jury trial, which the district court denied. The trial judge awarded Columbia a total of $8,800,000, and Feltner appealed. Applying the Seventh Amendment, the Supreme Court reversed, holding that, although the statute was silent on the subject, "the Seventh Amendment provides a right to a jury trial, which includes a right to a jury determination of the amount of statutory damages." Id.[8]

The plaintiff says that these two decisions support his conclusion that the medical malpractice cap violates his right to a jury trial. We do not agree. In relying on Hetzel, the plaintiff attempts to equate remittitur with the medical malpractice cap and argues that, since remittitur without the option of a new trial violates the Seventh Amendment right to a jury trial, application of the cap likewise violates Virginia's right to a jury trial. However, the plaintiff's initial premise is faulty because

_____

[8] The plaintiff acknowledges that the Seventh Amendment does not apply to procedures in state courts, but says that Supreme Court decisions interpreting the Seventh Amendment

9

remittitur and the cap are not equivalent and do not come into play under the same circumstances.  Remittitur, as well as additur, is utilized only after a court has determined that a party has not received a fair and proper jury trial.  Supinger, 255 Va. at 203, 495 S.E.2d at 815.  The cap, however, is applied only after a plaintiff has had the benefit of a proper jury trial.  In the latter situation, there is no right to a new trial, and the constitutional mandate has been satisfied.

The plaintiff's reliance on Feltner is also misplaced.  There, the Court dealt primarily with whether Columbia was entitled to a jury trial even though it elected to seek statutory damages.  The Court concluded that Columbia had the right to a jury trial because the common law afforded copyright owners causes of action for infringement, and these actions were tried before juries.  The Court recognized that "[t]he Seventh Amendment . . . applies not only to common-law causes of action, but also to 'actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.'"

---

are highly instructive in defining the scope of the right to a jury trial in litigation in state courts.

10

*Feltner*, ___ U.S. ___, 118 S.Ct. at 1284.  The Court did not address the validity of a cap on the recovery of damages.

Furthermore, while it does not appear that the Supreme Court has addressed the issue of the validity of state statutory caps, it has noted the decisions of two circuit courts of appeals on the subject.  See *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 429 n.9 (1996) (citing *Davis v. Omitowoju*, 883 F.2d 1155, 1161-65 (3rd Cir. 1989), and *Boyd v. Bulala*, 877 F.2d 1191, 1196 (4th Cir. 1989), as instances where courts of appeals have held that district court application of state statutory caps in diversity cases, post verdict, does not violate the Seventh Amendment).

*Boyd v. Bulala* dealt directly with Virginia's medical malpractice cap.  Noting that this Court recently had decided *Etheridge* and upheld the constitutionality of the cap against assertions, *inter alia*, that it denies the right of trial by jury, the Fourth Circuit held that, with respect to the Virginia Constitution, our decision in *Etheridge* was "absolutely binding."  877 F.2d at 1195.

Concerning the right of trial by jury under the Seventh Amendment, the Fourth Circuit followed our reasoning that it is not the role of the jury but of the

11

legislature to determine the legal consequences of the jury's factual findings.  Id.  However, the Fourth Circuit assigned this additional reason for upholding the validity of the cap against an assertion that it violated the right of trial by jury:

> It is by now axiomatic that the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object.  Indeed, the district court conceded that a legislature's outright abolition of a cause of action would not violate the seventh amendment.  If a legislature may completely abolish a cause of action without violating the right of trial by jury, we think it permissibly may limit damages recoverable for a cause of action as well.

Id. at 1196 (citations and interior quotation marks omitted).

Furthermore, the rule that a plaintiff may not recover more than the amount of an ad damnum clause is akin to a cap on damages.  Yet, the plaintiff in this case has not challenged the trial court's reduction of his $2,045,000 jury verdict to $2,000,000, the amount sued for, and it is doubtful that such a challenge would meet with success.

Nor can it be disputed that, in addition to abolishing a cause of action, a legislature may extinguish a cause of action by the imposition of a statute of limitations, for example, two years from the date of death in the case of an action for wrongful death.  Code § 8.01-244.  If it is

permissible for a legislature to enact a statute of limitations completely barring recovery in a particular cause of action without impinging upon the right of trial by jury, it should be permissible for the legislature to impose a limitation upon the amount of recovery as well.

The courts of other states have upheld medical malpractice caps against assertions that they violate the right to a jury trial. Johnson v. St. Vincent Hospital, Inc., 404 N.E.2d 585, 601-02 (Ind. 1980); Murphy v. Edmonds, 601 A.2d 102, 118 (Md. 1992); English v. New England Medical Center, Inc., 541 N.E.2d 329, 331-32 (Mass. 1989).

The plaintiff cites several out-of-state cases declaring medical malpractice caps unconstitutional, but we find them inapposite. Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala. 1991), criticized our decision in Etheridge but distinguished it, stating that Virginia's constitutional provision respecting the right to a jury trial "is materially distinguishable" from Alabama's. Id. at 163. Sofie v. Fibreboard Corp., 771 P.2d 711 (Wash. 1989), also criticized Etheridge, but stated that Virginia's constitutional provision relating to trial by jury is "quite different" from Washington's. Id. at 724. Smith v. Department of Insurance, 507 So.2d 1080 (Fla.

13

1987), involved an assertion that a medical malpractice cap violated a constitutional provision guaranteeing a right of access to the courts.  Florida law prohibits the legislature from abolishing a common law right without providing a "reasonable alternative."  Id. at 1088.  The cap was declared unconstitutional because the legislature had "provided nothing in the way of an alternative remedy or commensurate benefit."  Id. at 1089.  Virginia law does not impose such a quid-pro-quo requirement.

The plaintiff does cite two out-of-state decisions that are directly opposed to the Etheridge view with respect to trial by jury.  Tenold v. Weyerhaeuser Co., 873 P.2d 413 (Or. 1993); Guzman v. St. Francis Hosp., No. 97-CV-007107 (Cir.Ct. Milwaukee County Wis. 1998).  We disagree with both decisions.

In summary, we advert to the plaintiff's argument, supra, that "the mandate of Article I, § 11 includes the right to receive the amount of damages awarded by a jury after a proper trial."  We point out, however, that "the jury trial guarantee secures no rights other than those that existed at common law [and] the common law never recognized a right to a full recovery in tort."  Etheridge, 237 Va. at 96, 376 S.E.2d at 529 (citing Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 88-

89 n.32 (1978), and Phipps Adm'r v. Sutherland, 201 Va. 448, 452, 111 S.E.2d 422, 425 (1959)).  It follows, therefore, that the medical malpractice cap does not impinge upon the right to trial by jury.

## 2.  Special Legislation.

Article IV, § 14 of the Constitution of Virginia provides that "[t]he General Assembly shall not enact any local, special, or private law . . . (18) [g]ranting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity."[9]  In Etheridge, we noted that we had previously held that laws may be made to apply to a class only, even though the class may be small, provided the classification is reasonable, not arbitrary, and the law is made to apply to all persons in the class without distinction.  237 Va. at 102, 376 S.E.2d at 533.  We also noted that if the classification bears a reasonable and substantial relation to the object sought to be accomplished, it will survive a special-laws constitutional challenge.  Id.

---

[9] The plaintiff also contends that the medical malpractice cap "violates Article I, § 4 of the Constitution of Virginia and its prohibition against 'exclusive or separate emoluments or privileges.'"  However, as Etheridge points out, this clause is intended to shield against heredity in office and has no application to this type of case.  237 Va. at 101, 376 S.E.2d at 532.

15

We then pointed out that, in enacting the Medical Malpractice Act, the General Assembly, after a careful and deliberate study, had determined health care providers faced increasing difficulty obtaining affordable malpractice coverage in excess of $750,000, thus reducing the number of such providers available to serve Virginia's citizens. We also pointed out that the General Assembly had determined that this significant problem adversely affected the public health, safety, and welfare and necessitated the imposition of a limitation upon the liability of health care providers in medical malpractice actions. Id. at 102-03, 376 S.E.2d at 533.

We observed that the General Assembly had decided that damage awards in medical malpractice cases should not exceed $750,000 (now $1,000,000), and we stated that the limitation applied to all health care providers and all medical malpractice patients. Id. at 103, 376 S.E.2d at 533. We found that the classification was not arbitrary, that it bore a reasonable and substantial relation to the object sought to be accomplished, and that it applied to all persons belonging to the class without distinction. Id. Accordingly, we concluded that the legislation did not violate the prohibition against special legislation. Id.

16

When we get to the plaintiff's arguments on this subject, we encounter considerable difficulty.  Aside from an "as applied" argument involving Coastal only, which we will consider shortly, the plaintiff stated during oral argument there were two reasons that the statute imposing the medical malpractice cap constituted special legislation.

The first reason, the plaintiff said, is set forth in the dissent in Fairfax Hospital System, Inc. v. Nevitt, 249 Va. 591, 457 S.E.2d 10 (1995), a case not involving a special legislation question but an issue concerning the interaction between the medical malpractice cap and Code § 8.01-35.1, which provides that the amount recovered against one tortfeasor shall be reduced by the amount paid in settlement by another tortfeasor.  In the portion of the dissent upon which the plaintiff relies, the dissenters accuse the majority of using the medical malpractice cap, as it interacts with the release statute, in a manner "foreign to its purpose and consequent constitutional justification of fostering affordable medical malpractice insurance."  Id. at 600, 457 S.E.2d at 15.

The plaintiff's second reason for saying the cap constitutes special legislation is based upon a statement made in a report prepared by the State Corporation

17

Commission in 1975 on "Medical Malpractice Insurance in Virginia." This report was attached as an exhibit to Senate Document 29, which consists of the 1976 interim report of a legislatively created Commission to Study the Costs and Administration of Health Care Services. 3 House and Senate Documents (1976 Session). On page 92 of its report, the State Corporation Commission stated: "In fact, existing evidence indicates that several of the more popular solutions (e.g., a $500,000 limit on the amount recovered) will not reduce the cost of malpractice premiums in a jurisdiction like Virginia where awards or settlements seldom exceed $250,000." This proves, the plaintiff said during oral argument, that the cap does not bear a reasonable and substantial relation to the object sought to be accomplished and, therefore, constitutes special legislation.

The difficulty with these two arguments is that they first surfaced during oral argument before this Court. They do not appear in the record below, in the plaintiff's petition for appeal, or in his appellate briefs. Consequently, we will not consider them. Rule 5:25.

The plaintiff's "as applied" argument concerning Coastal stems from the fact that, in 1994, the General

18

Assembly amended Code § 8.01-581.1 by adding new entities

to the definition of "[h]ealth care provider," as follows:

> (vi) a corporation, partnership, limited
> liability company or any other entity,
> except a state-operated facility, which
> employs or engages a licensed health care
> provider and which primarily renders health
> care services.

The plaintiff argues that the 1994 amendment contained

no statement of purpose and, therefore, that it fails the

test that a statutory scheme, as applied, must bear a

reasonable and substantial relationship to the object

sought to be accomplished by the legislation.  There is a

reasonable inference, however, that the General Assembly

intended the amendment to serve the same purpose as the

original enactment of the medical malpractice cap, i.e., to

provide "a remedy for a perceived social problem, the

unavailability of medical malpractice insurance at

affordable rates."  Etheridge, 237 Va. at 108, 376 S.E.2d

at 536 (Russell, J., dissenting).

The plaintiff also argues that in Schwartz v.

Brownlee, 253 Va. 159, 482 S.E.2d 827 (1997), we said that

the purpose in the enactment of the Medical Malpractice Act

was to enable licensed health care providers to secure

medical malpractice insurance at affordable rates and that

it "would not serve that purpose to extend the protection

19

of the cap to non-health care providers." Id. at 167, 482 S.E.2d at 832. From this, the plaintiff argues that because Coastal is not a licensed health care provider, extension of the cap to Coastal does not bear a reasonable and substantial relationship to the object sought to be accomplished by the medical malpractice cap, and the 1994 amendment, therefore, constitutes special legislation.

But the language in Schwartz was limited to licensed health care providers because, at the time the injury in Schwartz occurred, the cap was applicable only to licensed health care providers. We noted that the 1994 amendment had been enacted, but pointed out that the enactment occurred subsequent to the injury. Id. at 164 n.3, 482 S.E.2d at 830 n.3. While we stated it would not serve the purpose of the medical malpractice cap to extend its protection to non-health care providers, entities like Coastal are no longer non-health care providers as a result of the 1994 amendment and, as to them, the statement is now irrelevant. And it may be added that, under its contract with Southside Regional, Coastal is required to be covered by professional liability insurance with limits of at least $1,000,000 per occurrence and $3,000,000 annual aggregate, so Coastal has a direct interest in the availability of

professional liability insurance at affordable rates and fits within the class the cap is intended to protect.[10]

The remainder of the plaintiff's "as applied" argument is confined to the proposition that the medical malpractice cap concentrates the costs solely upon those whose losses are greatest while identifying "a specific elite class, described as 'health care providers,' to which it accords special privileges and immunities that are given to no other tortfeasors in this Commonwealth."  And the plaintiff indicates his agreement with the dissent in Etheridge that the General Assembly acted arbitrarily in restricting the cap so that it did not apply to "all plaintiffs and all defendants regardless of their identities."  Etheridge, 237 Va. at 112, 376 S.E.2d at 538.

The difficulty with the plaintiff's argument and, indeed, with the dissent in Etheridge, is that both place much greater emphasis upon the classes affected by the cap than upon the real test for determining whether a statute

---

[10] Coastal also agreed in its contract with Southside Regional that "each of [its] Physicians shall be covered by professional liability insurance with limits of at least $1,000,000.00 per occurrence and $3,000,000.00 annual aggregate."  Coastal concedes that this provision only "obligated [it] to ensure that the Physicians were covered by malpractice insurance," rather than obligating Coastal to provide the coverage itself.  Even so, this gives Coastal at least an indirect interest in the availability of such insurance at affordable rates.

withstands a special-laws challenge.[11]  Classifications are

relevant, of course, and should be given consideration in

determining whether a particular legislative act

constitutes special legislation.  But the real test "for

statutes challenged under the special-laws prohibitions in

the Virginia Constitution is that they must bear 'a

reasonable and substantial relation to the object sought to

be accomplished by the legislation.'"  Benderson

Development Co. v. Sciortino, 236 Va. 136, 147, 372 S.E.2d

751, 757 (1988) (quoting Mandell v. Haddon, 202 Va. 979,

991, 121 S.E.2d 516, 525 (1961)).  And, while we think that

the classification involved in this case is reasonable, not

arbitrary, and that the medical malpractice cap is made to

apply to all the persons within a particular class without

distinction, "the necessity for and the reasonableness of

classification are primarily questions for the legislature.

If any state of facts can be reasonably conceived . . .

that would sustain it, that state of facts at the time the

---

[11] The dissenters in Etheridge were concerned that the
Medical Malpractice Act left "uncovered" entities which
rendered health care services but were not licensed in this
Commonwealth.  237 Va. at 110, 376 S.E.2d at 537.  This
concern should be allayed, however, by the 1994 amendment
to Code § 8.01-581.1, which added to the definition of
"[h]ealth care provider" numerous unlicensed entities which
employ or engage licensed health care providers and which
primarily render health care services.

law was enacted must be assumed."  Martin's Ex'rs v. Commonwealth, 126 Va. 603, 612-13, 102 S.E. 77, 80 (1920).

Here, however, we do not have to assume a set of facts that would sustain the medical malpractice cap.  The actual facts were as stated in Etheridge:  "The General Assembly concluded [after careful and deliberate study] that escalating costs of medical malpractice insurance and the availability of such insurance were substantial problems adversely affecting the health, safety, and welfare of Virginia's citizens."  237 Va. at 94, 376 S.E.2d at 528. Given these facts, we think the cap bears a reasonable and substantial relation to the General Assembly's objective to protect the public's health, safety, and welfare by insuring the availability of health care providers in the Commonwealth.  Accordingly, we conclude that the medical malpractice cap does not constitute special legislation.

### 3.  Taking of Property.

Under the Fifth Amendment to the Constitution of the United States, private property shall not be taken for public use without just compensation.  Under art. I, § 11 of the Constitution of Virginia, private property shall not be taken or damaged for public uses without just compensation.

23

Here, the argument is that the effect of the medical malpractice cap is to take the property of the plaintiff and his son in violation of these constitutional provisions. As the statutory beneficiaries of Mrs. Pulliam, the argument goes, the plaintiff and his son "had a property interest in the full measure of the jury's verdict."

We disagree. In Hess v. Snyder Hunt Corp., 240 Va. 49, 392 S.E.2d 817 (1990), we considered a challenge to the constitutionality of Code § 8.01-250, a statute of repose which, upon the expiration of a fixed time, "extinguishes 'not only the legal remedy but also all causes of action, including those which may later accrue as well as those already accrued.'" Id. at 52, 392 S.E.2d at 819 (quoting School Board v. United States Gypsum Co., 234 Va. 32, 37, 360 S.E.2d 325, 327-28 (1987)). The challenge to Code § 8.01-250 was that it deprived persons of life, limb, or property without due process of law in violation of amend. XIV, § 1 of the United States Constitution and art. I, § 11 of the Virginia Constitution. Hess, 240 Va. at 52, 392 S.E.2d at 820.

We said in Hess that it is only when a right has accrued or a claim has arisen that it is subject to the protection of the due process clause. 240 Va. at 54, 392

24

S.E.2d at 821. We said further that "Code § 8.01-250 does not disturb a vested right, for '[n]obody has a vested right in the continuance of the rules of the common law.'" Id. (citing Munn v. Illinois, 94 U.S. 113, 134 (1877)). Continuing, we stated that "the fourteenth amendment does not forbid a legislature from abolishing old rights recognized by the common law in order to attain a permissible legislative objective." Id. at 54, 360 S.E.2d at 821. Finally, we said that "if a legislature can abolish a cause of action for a legitimate legislative purpose, it also may prevent a cause of action from arising by enacting a statute of repose for such a purpose." Id.

This rationale applies with equal force here. The plaintiff's cause of action for wrongful death had not accrued at the time the cap was imposed upon recoveries in medical malpractice cases. One cannot obtain a property interest in a cause of action that has not accrued, and there was nothing to prevent the General Assembly from limiting the remedy, so far as unaccrued causes of action are concerned, to attain a permissible legislative objective without running afoul of the "taking" clauses of the Federal and State Constitutions. Accordingly, we find no violation of the "taking" clauses in this case.

### 4. Due Process.

25

## 5. Equal Protection.

In oral argument, the plaintiff combined these two subjects and attempted to convince the Court that it should apply an intermediate level of scrutiny, rather than the lower-level rational basis test, in our due process and equal protection analysis of the medical malpractice cap.[12] However, we ruled in Etheridge that, in a due process or equal protection analysis, the rational basis test applies unless a fundamental right or a suspect class is affected. 237 Va. at 97, 103, 376 S.E.2d at 530, 534.  And we noted that those interests that have been recognized as "fundamental" include the right to free speech, the right to vote, the right to interstate travel, the right to fairness in the criminal process, the right to marry, and the right to fairness in procedures concerning governmental deprivation of life, liberty, or property.  Id. at 98, 376 S.E.2d at 530.  We noted further that suspect classifications are those based upon race and national origin and that classifications based upon gender, alienage, and illegitimacy are entitled to receive a level

---

[12] The plaintiff states on brief that he "incorporates by reference the due process arguments considered and rejected by this Court in Etheridge."  However, we do not consider arguments incorporated by reference; all arguments "must be made in the appellate briefs."  Williams v. Commonwealth, 248 Va. 528, 537, 450 S.E.2d 365, 372 (1994).

of scrutiny between strict scrutiny and the rational basis test. Id. at 103 n.7, 376 S.E.2d at 534 n.7. Here, however, no fundamental right or suspect class is affected by application of the medical malpractice cap.

Accordingly, we are of opinion that Etheridge enunciated the correct level of scrutiny and that the rational basis test continues to provide the proper standard for determining whether there has been a denial of due process or equal protection in a case involving the medical malpractice cap. The rational basis test is satisfied from a due process standpoint if the challenged legislation has a reasonable relation to a proper purpose and is not arbitrary or discriminatory, id. at 97, 376 S.E.2d at 530, or, from an equal protection standpoint, if the legislature could reasonably have concluded that the challenged classification would promote a legitimate state purpose, id. at 104, 376 S.E.2d at 534.

We think that the medical malpractice cap passes the test of constitutionality when judged against these standards, primarily for the reasons previously enunciated in Part A(2) of this opinion regarding special legislation. Accordingly, we hold that the plaintiff has suffered no denial of due process or equal protection from application of the cap to the jury verdict in this case.

The plaintiff stated in oral argument, however, that, even if the rational basis test applies, there still would be a denial of due process and equal protection in this case for two reasons, one based upon the dissent in Fairfax Hospital System, Inc. v. Nevitt, supra, and the other upon the statement in Senate Document No. 29 concerning the efficacy of the medical malpractice cap for its intended purpose.  But, as we noted in Part A(2) of this opinion, arguments based upon the Nevitt dissent and the Senate Document statement cannot be considered because they were raised for the first time on appeal.  Rule 5:25.

### 6.  Separation of Powers.

### 7.  Province of the Judiciary.

Because these two subjects are related, we will discuss them together.  The plaintiff argues that the medical malpractice cap violates the separation of powers doctrine and also invades the province of the judiciary.

In rejecting a separation of powers challenge in Etheridge, we pointed out that under art. VI, § 1 of the Virginia Constitution, the General Assembly, subject to provisions relating to the power and jurisdiction of this Court, has "the power to determine the original and appellate jurisdiction of the courts of the Commonwealth." 237 Va. at 100, 376 S.E.2d at 532.  We also noted that

28

under art. IV, § 14 of the Constitution, the General Assembly's authority extends "to all subjects of legislation not herein forbidden or restricted," and that the common law is one area in which the General Assembly's authority has not been forbidden or restricted. Id.

Accordingly, we said that the legislature has the power to provide, modify, or repeal a remedy. 237 Va. at 101, 376 S.E.2d at 532. And we concluded that "whether the remedy prescribed in Code § 8.01-581.15 is viewed as a modification of the common law or as establishing the jurisdiction of the courts in specific cases, clearly it was a proper exercise of legislative power." 237 Va. at 101, 376 S.E.2d. at 532.

This rationale applies with equal force here, and it should be sufficient to dispose of the plaintiff's arguments concerning separation of powers and the province of the judiciary, but the plaintiff disagrees. He says that art. VI, § 5 of the Constitution of Virginia establishes that "the judiciary, not the legislature, makes the rules applicable to jury verdicts."

On brief, the plaintiff quotes art. VI, § 5 as providing that this Court has "the authority to make rules governing . . . the practice and procedures to be used in the courts of the Commonwealth. . . ." However, what the

plaintiff has omitted at the end of this quotation is of crucial importance.  The full text of art. VI, § 5 reads as follows:

> The Supreme Court shall have the authority to make rules governing the course of appeals and the practice and procedures to be used in the courts of the Commonwealth, <u>but such rules shall not be in conflict with the general law as the same shall, from time to time, be established by the General Assembly</u>.

(Emphasis added.)  In addition, Code § 8.01-3, which is listed in the cross-reference following art. VI, § 5, provides that, while this Court "may prepare a system of rules of practice and a system of pleading and the forms of process, . . . <u>[t]he General Assembly may, from time to time, by the enactment of a general law, modify, or annul any rules adopted or amended pursuant to this section</u> [and in] the case of any variance between a rule and an enactment of the General Assembly such variance shall be construed so as to give effect to such enactment."  (Emphasis added.)

Thus, we find no merit in the plaintiff's arguments concerning separation of powers and the province of the judiciary.  Accordingly, we reject the arguments.

### B.  Health Care Provider.

As noted in Part A(2) of this opinion, Code § 8.01-581.1 defines a "[h]ealth care provider" to include:

30

(vi) a corporation, partnership, limited liability company or any other entity, except a state-operated facility, which employs or engages a health care provider and which primarily renders health care services.

The plaintiff contends that the medical malpractice cap does not apply to Coastal because the cap applies only to health care providers and "[t]here simply is nothing in the trial record evidencing that Coastal 'primarily renders health care services,' an essential component of § 8.01-581.1's definition of 'health care provider.'"  The plaintiff says that Coastal is nothing more than "a specialized type of employment placement service."

However, the evidence shows that Coastal was quite different from an employment placement service.  Coastal's senior vice-president testified that Coastal was created to provide emergency physicians to staff emergency departments of hospitals and that "[i]s . . . what it in fact does."

Coastal's contract with Southside Regional obligated Coastal to provide at least five physicians to render "professional and administrative services in [Southside's Emergency] Department on a full-time basis . . . 24 hours a day, 7 days a week."  Coastal agreed that the physicians would direct and supervise all medical services in the emergency department, participate in educational programs, and perform teaching functions.  Coastal also agreed to

31

provide information to Southside Regional regarding budgetary needs of the emergency department and to perform a number of other administrative tasks.

In addition, the contract required Coastal to designate one of its physicians, serving as its employee, to be "the Chief/Medical Director of the Department." This doctor's duties were to "provide overall medical direction in the continuing operation" of the emergency department, "assure that the quality, safety and appropriateness of patient care in the Department are evaluated," and "see that the performance of the Physicians is in accordance with" the contract. The contract "entitled [Coastal] to bill patients for professional services rendered by the Physicians." The contract provided that Coastal's fees would be independent of Southside Regional's charges and that neither Coastal nor the physicians would receive any compensation from Southside Regional for services rendered pursuant to the contract.

Coastal owns no emergency room facility or equipment and employs no support personnel such as nurses or technicians. Instead, it enters into contracts with physicians and pays them for their services. In Dr. DiGiovanna's case, the contract stipulated that his professional services would be provided at designated

32

medical institutions and that Coastal would pay a set fee for each hour during which he provided services pursuant to the contract.

The plaintiff says that, as a matter of law, the trial court erred in concluding that Coastal carried its burden of proving it primarily renders health care services within the meaning of the definition of "[h]ealth care provider" in Code § 8.01-581.1(vi).  We disagree with the plaintiff. The contract between Coastal and Southside Regional clearly provided for the rendering of health care services in Southside Regional's emergency room.  Coastal is a corporation created to provide emergency physicians to staff emergency departments of hospitals for the purpose of rendering health care services in such departments.  A corporation can act only through its officers and agents. Greenberg v. Commonwealth, 255 Va. 594, 600, 499 S.E.2d 266, 269 (1998).  It is a concession in the case that Dr. DiGiovanna was the agent of Coastal, and it was in this capacity that he rendered health care services to Mrs. Pulliam in the emergency room of Southside Regional on December 15, 1995.  In our opinion, all the foregoing established at least a prima facie case that Coastal was an entity "which primarily renders health care services" within the meaning of the definition of "[h]ealth care

33

provider" in Code § 8.01-581.1(vi).  The trial court did not err, therefore, in holding that Coastal had carried its burden of proof.

### C.  Prejudgment Interest.

As noted previously, the jury allowed interest from the date of Mrs. Pulliam's death, but the trial court disallowed the award on the ground that prejudgment interest is subject to the medical malpractice cap.  The plaintiff says this was error.

The plaintiff points out that, under Code § 8.01-581.15, the total amount recoverable for any injury to, or death of, a patient shall not exceed one million dollars. The plaintiff says that interest is not "for" such injury or death, and, quoting Nationwide Mut. Ins. Co. v. Finley, 215 Va. 700, 214 S.E.2d 129 (1975), the plaintiff argues that "[t]he interest the law allows on judgments is not an element of 'damages' but a statutory award for delay in the payment of money due."  Id. at 702, 214 S.E.2d at 131.

We disagree with the plaintiff.  Finley involved postjudgment interest.  Id. at 701, 214 S.E.2d at 130; Dairyland Ins. Co. v. Douthat, 248 Va. 627, 632, 449 S.E.2d 799, 801 (1994).  And we said in Dairyland that there is "an important distinction between prejudgment interest and postjudgment interest."  Id. at 631, 449 S.E.2d at 801.

34

"Underlying this distinction," we continued, "is the principle that '[p]rejudgment interest is normally designed to make the plaintiff whole and is part of the actual damages sought to be recovered.'" Id. (quoting Monessen Southwestern Ry. v. Morgan, 486 U.S. 330, 335 (1988)). "In contrast," we said, "postjudgment interest is not an element of damages, but is a statutory award for delay in the payment of money actually due." 248 Va. at 632, 449 S.E.2d at 801.

The plaintiff attempts to distinguish Dairyland on the basis of a concession made there by the parties sought to be charged that "prejudgment interest is an element of compensatory damages." Id. at 630, 449 S.E.2d at 801. The plaintiff says that this concession eliminated "the need for this Court to reach that issue."

It is true that such a concession was made in Douthat, but this Court distinctly made the holding that "prejudgment interest . . . is part of the actual damages sought to be recovered," id. at 631, 449 S.E.2d at 801, and we cited Monessen as authority for the holding. If that was this Court's holding, then prejudgment interest is part of "the total amount recoverable for any injury to, or death of, a patient," within the meaning of Code § 8.01-581.15, and subject to the medical malpractice cap of one

million dollars.  But if any question remains about the holding, the question will be eliminated by our affirmance of the trial court's judgment in all respects.

### D.  Conclusion.

In conclusion, we note that Etheridge has been cited in sixteen subsequent opinions of this Court without any indication to the bench, the bar, or the public that flagrant error or mistake exists in the decision.  This underscores the significance of what we said in Myers v. Moore, 204 Va. 409, 131 S.E.2d 414 (1963), a case involving the constitutionality of the Virginia Water and Sewer Authorities Act:

> The reason for the [stare decisis] principle is that in a well ordered society it is important for people to know what their legal rights are, not only under constitutions and legislative enactments but also as defined by judicial precedent, and when they have conducted their affairs in reliance thereon they ought not to have their rights swept away by judicial decree when at a later date other grounds may be conceived to attack the constitutionality of a statute.  This is especially true where property rights are involved.  Under the Authorities Act numerous improvement districts have been created and financed in reliance upon the pronouncement of this Court that it is free from constitutional objections.  Thus the doctrine of stare decisis, one of the most important principles in the structure of our law, should here apply with all its force.

Id. at 413, 131 S.E.2d at 417.

Affirmed.

36

JUSTICE HASSELL, with whom JUSTICE KEENAN and JUSTICE KOONTZ join, concurring.

I believe that the result reached by the majority is compelled by the absence of a sufficient record in this appeal.

Article IV, Section 14, of the Constitution of Virginia provides, in part, that:  "[t]he General Assembly shall not enact any local, special, or private law . . . [g]ranting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity."  Va. Const. art. IV, sec. 14(18).  Article IV, Section 15, Va. Const., provides, in pertinent part:

> "In all cases enumerated in the preceding
> section, . . . the General Assembly shall enact
> general laws.  Any general law shall be subject
> to amendment or repeal, but the amendment or
> partial repeal thereof shall not operate directly
> or indirectly to enact, and shall not have the
> effect of enactment of, a special, private, or
> local law.
>
> . . . .
>
> "No private corporation, association, or
> individual shall be specially exempted from the
> operation of any general law, nor shall a general
> law's operation be suspended for the benefit of
> any private corporation, association, or
> individual."

The constitutional prohibition against special laws does not prohibit legislative classifications.  King v. Neurological Injury Compensation Program, 242 Va. 404, 409,

37

410 S.E.2d 656, 660 (1991). Rather, the prohibitions

require that such classifications be "natural and

reasonable, and appropriate to the occasion." Benderson

Dev. Co. v. Sciortino, 236 Va. 136, 140-41, 372 S.E.2d 751,

753 (1988); King, 242 Va. at 409, 410 S.E.2d at 659.

In Mandell v. Haddon, 202 Va. 979, 989, 121 S.E.2d

516, 524 (1961), we observed that:

> "[W]e must determine in each case whether [a
> challenged act] makes an 'arbitrary separation,'
> and this depends upon the purpose and subject of
> the particular act and the circumstances and
> conditions surrounding its passage.
>     "The necessity for and the reasonableness of
> the classification are primarily questions for
> the legislature. If any state of facts can be
> reasonably conceived that would support it, that
> state of facts at the time the law was enacted
> must be assumed. Martin's Ex'rs v. Commonwealth
> . . . 126 Va. [603,] 612, 102 S.E. [77,] 80,
> [(1920)]; Joy, Draheim & Cox v. Green . . . 194
> Va. [1003,] 1009, 76 S.E.2d [178,] 182 [(1953)].
> The presumption is that the classification is
> reasonable and appropriate and that the act is
> constitutional unless illegality appears on its
> face."

I can only conclude, based upon the record before this

Court, that Code § 8.01-581.15 does not contravene

Virginia's constitutional prohibition against special

legislation. The determinative issue is whether the

statute as applied "bear[s] a reasonable and substantial

relation to the object sought to be accomplished by the

legislation." Mandell, 202 Va. at 991, 121 S.E.2d at 525.

38

The record before this Court simply does not demonstrate that the challenged statute fails to bear a reasonable and substantial relationship to the object sought to be accomplished by the legislation.  In other words, Karl B. Pulliam, executor of the estate of Elnora R. Pulliam, did not present evidence to rebut the presumption that the legislative classification limiting damages was reasonable. He failed to establish that the limitation of damages was unsupported by any reasonably conceivable state of facts at the time the statute was enacted.  Thus, he did not meet the standard that must be established before the statute can be declared constitutionally impermissible.  I agree with the majority's resolution of the remaining issues.

JUSTICE KINSER, concurring.

I agree with the majority's rationale and decision that the medical malpractice recovery cap contained in Code § 8.01-581.15 does not violate any provision of either the Constitution of the United States or the Constitution of Virginia.[13]  I reach this conclusion without considering the role that stare decisis should play in this case.  I write

---

[13]  I also agree with the majority's decision that Coastal Emergency Services of Richmond, Inc., is a "health care provider" under Code § 8.01-581.1 and that prejudgment interest is subject to the medical malpractice cap.

separately for the sole purpose of expressing my belief that the medical malpractice cap creates an unwarranted injustice in certain situations.

The General Assembly has the responsibility to protect the health, welfare, and safety of the citizens of this Commonwealth through appropriate legislation.  However, the medical malpractice cap works the greatest hardship on those individuals who are the most severely injured by the negligence of health care providers.  Nevertheless, I cannot be influenced by such concerns when deciding the constitutionality of a challenged statute.  I can only express my views with the hope that the General Assembly will adopt a more equitable method by which to ensure the availability of health care in this Commonwealth.