553 S.E.2d 773

**HUNTINGTON EYE ASSOCIATES, INC.,**
Plaintiff below, Appellant,

v.

**Joseph A. LoCASCIO, III, M.D.,**
Defendant below, Appellee.

No. 28889.

Supreme Court of Appeals of
West Virginia.

Submitted June 12, 2001.

Decided July 6, 2001.

James B. Lees, Jr., Esq., Sharon F. Iskra, Esq.; Hunt & Lees, Charleston, for Appellant.

Daniel J. Konrad, Esq., R. Kemp Morton, Esq., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, for Appellee.

PER CURIAM.

This is an appeal of an order of the Circuit Court of Cabell County that in essence set aside a plaintiff's verdict and directed a verdict in favor of the defendant. The court also, in the alternative, awarded the defendant a new trial.

I.

The appellant and plaintiff below is Huntington Eye Associates, Inc. ("HEA"), a corporation that is solely owned by Dr. Tully Roisman, M.D., an ophthalmologist. The appellee and defendant below is Dr. Joseph A. LoCascio, III, M.D., also an ophthalmologist.

Dr. Roisman created HEA as a business structure for the ophthalmology practice that Dr. Roisman began in Huntington, West Virginia in 1983.[1] Dr. Roisman wished to build HEA into a regional, multi-physician, multi-specialist ophthalmology practice. In the course of developing HEA, Dr. Roisman invested substantial amounts of his personal monies, brought the first laser to ophthalmology practice in Huntington, recruited subspecialists in corneal and retinal work, and founded treatment programs for diabetics. Dr. Roisman also developed a network of consultation and referral involving optometrists and other physicians in a wide geographic area around HEA's principal office in Huntington, West Virginia.[2]

Dr. Roisman met Dr. LoCascio, who was then living in New York State, in 1989, at a "placement exchange" held in connection with a medical professional gathering. Dr. Roisman was a fully trained, certified, and

1. In connection with the matters that are at issue in the instant case, the activity and conduct of Dr. Roisman was also the activity and conduct of the corporate entity that Dr. Roisman owns—that is, of HEA. In this opinion we will therefore often refer to Dr. Roisman with the understanding that HEA is included in that reference.

2. At the time Dr. LoCascio came to work for HEA in 1990, HEA also owned and operated a branch office in Portsmouth, Ohio. Apparently the Portsmouth, Ohio office closed shortly after

Dr. LoCascio left HEA in 1994, and another branch office was opened in Ashland, Kentucky. Additionally, after Dr. LoCascio joined HEA, HEA staff began working part-time at three other HEA "branch offices" (as Dr. Roisman referred to them at trial)—in Williamson, West Virginia; Ironton, Ohio; and Teays Valley, West Virginia. However, these facilities were owned and operated by non-HEA physicians; HEA staff went to these offices several times a month to provide specialist services to patients.

experienced cornea and cataract specialist. After practicing in several other geographic areas, Dr. LoCascio wished to relocate and to join a multi-physician practice that drew from a large geographic area. He had no contacts or prior experience in the Huntington area.

Dr. Roisman and Dr. LoCascio engaged in substantial negotiations about the terms of Dr. LoCascio's joining HEA, and Dr. LoCascio was represented by experienced legal counsel. Dr. LoCascio was no stranger to medical employment contracts, having been in litigation with his previous employer about such a contract.

The contract that was ultimately agreed upon by Dr. Roisman and Dr. LoCascio provided that Dr. LoCascio would be employed by HEA for an initial 1–year term at a salary of $175,000, at the end of which period Dr. LoCascio would make a decision to either stay and join the practice, or to depart. If Dr. LoCascio chose to stay with HEA, the contract provided that Dr. LoCascio would remain an HEA employee for 3 more years, at increasing salary levels: $225,000 the second year, $275,000 the third year, and $325,000 the fourth year. At the end of 4 years, the contract called for Dr. LoCascio to buy an equal ownership share of HEA stock. The size of that share would depend on how many doctors at that time were stockholders in HEA or were employees with an option to buy a share, when their ability to do so accrued pursuant to their contract.

In addition to his salary, Dr. LoCascio also received from HEA full medical insurance benefits, professional liability insurance, licensing and education costs, and the use of a leased car. The contract provided that if LoCascio left the HEA practice, he would not perform vision services within 50 miles of any HEA office for a period of 2 years post-departure. Specifically, the contract said:

19. RESTRICTIONS: HEA will provide Physician [Dr. LoCascio] with complete access to its books, records, patient lists and dates, as well as its professional methods, procedures, contracts, knowledge and experience, to an extent which HEA would not provide Physician except in contemplation of this Agreement. **Physician has represented to HEA and its officers that he does not intend or desire to remain or practice medicine within the area professionally served by HEA, if in fact he does not remain employed by HEA and if he does not purchase such equity stock interest in HEA, as herein contemplated.** Therefore, in consideration of the covenants and agreement on the part of HEA as set forth in this Agreement, both for employment and for the sale of said stock, **Physician does covenant and agree with HEA that in the event his employment with HEA shall be terminated for any reason whatsoever, then and in such event Physician agrees that he will not engage in the practice of ophthalmic medicine, for a period of at least two (2) years after leaving the employment of HEA, within a radius of fifty (50) miles of the city limits of Huntington, West Virginia or of any HEA branch office. Physician acknowledges that in the event he breaches such agreement herein made on his part, then HEA will suffer damage by virtue of the premises and such breach, and the parties do hereby agree that the amount of such damage in such event would be a sum equal to two (2) years' total compensation at the rate provided for Physician in this Agreement, and in effect at the time of such breach.** Similar restrictions will be applied to all physicians, stockholder and non-stockholder, of HEA.

(Emphasis added.)

Dr. LoCascio worked for HEA for the 1–year "trial period." He had a full patient load from the first day, and he participated fully in the HEA practice, coming to know the local medical market and community. At the end of his first year, Dr. LoCascio elected to remain at HEA, and to "buy in" and become one of the owners of HEA in 3 years. Dr. LoCascio was paid the increasing salary and benefits that were specified in his contract for the next 3 years. Dr. LoCascio's billings generated gross revenues for HEA that were substantially in excess of his salary; however, HEA covered all of the overhead of his practice.

In early to mid–1994, Dr. LoCascio began to look for other employment. He traveled to Seattle, Washington, and to other locations to explore other employment opportunities. Dr. LoCascio testified that his exploration of other possible employment resulted from his belief that he might not do well financially by buying into the HEA practice. According to Dr. LoCascio, one consideration was that two physicians who had come to HEA had left without joining the practice as owners—and with those physicians gone, Dr. LoCascio believed that buying into HEA might not be consistent with his financial goals. However, at the same time that Dr. LoCascio was exploring other employment alternatives, he was also negotiating with Dr. Roisman about possibly revising the contractual terms regarding the cost of a buy-in at HEA.

In October of 1994, Dr. LoCascio and Dr. Roisman participated in a meeting with several "technician" employees who worked in the HEA offices. These employees tested patients' vision, using eye charts, lenses, and similar equipment—to obtain visual acuity test result numerical readings, like $^{20}\!/_{20}$, $^{20}\!/_{30}$, etc. Some of the technician employees had received special certification in connection with this work; others had not, and it does not appear that such certification was legally required. Most had learned the testing procedures on the job.

The results of the technicians' visual testing were recorded by the technician on a patient's chart. The technician would then leave the patient, who would wait for an HEA doctor, like Dr. Roisman or Dr. LoCascio—who would then examine the patient, having the technician's test results in hand. The interpretation of the test results, any additional testing or re-testing, and any medical diagnosis and prescription, were the sole responsibility of the physician.

At the October 1994 meeting, the technician employees complained that Dr. Roisman had in a number of instances superseded or invalidated the visual acuity test results that the technicians had written on a patient's chart—by crossing through (but ordinarily not obliterating) the technician's results, and substituting Dr. Roisman's own numbers on the patient's chart. According to the testimony of several technicians at the trial in the instant case, Dr. Roisman's revisions occurred in almost all instances where a patient in fact had cataracts, but where the technician's test result numbers were not severe enough to permit Medicare reimbursement for the patient's cataract surgery. The evidence was unrefuted at trial that such changes by Dr. Roisman occurred with some regularity—although clearly they were not the ordinary case.

At the meeting, Dr. Roisman did not give much shrift to the technicians' complaints. However, Dr. LoCascio said that he was very surprised by the complaints, and he testified that he pulled several hundred of Dr. Roisman's charts for review. Dr. LoCascio further testified that he found the complaints to be corroborated by the charts. Dr. LoCascio testified that he decided, on the basis of the meeting and his review of Dr. Roisman's charts, that he, Dr. LoCascio, would definitely not stay at HEA because of what Dr. LoCascio believed to be seriously unethical and fraudulent conduct by Dr. Roisman.

There are, of course, two sides to the issue of the alleged misconduct by Dr. Roisman that Dr. LoCascio claimed both led to and legally justified his leaving HEA. It is appropriate at this juncture to skip ahead a bit and summarize the other evidence that developed on this issue—before continuing the narrative of the events that culminated in the lawsuit, trial, and court order that form the basis of the appeal that is before this Court in the instant case.

To complete Dr. LoCascio's side of the story: at trial Dr. LoCascio amplified on the complaints that the technicians had made about Dr. Roisman. Dr. LoCascio called as a witness a doctor who had left HEA and a physician expert on Medicare, who accused Dr. Roisman of dishonesty and fraud, and of doing unnecessary cataract surgery on patients who did not yet have sufficiently limiting impairments from their cataracts. Dr. LoCascio also put several former HEA employee technicians on the stand, who repeated their allegations about Dr. Roisman's changing test results, and who also accused Dr. Roisman of coaching patients about what lines on an eye chart that they should be

unable to read, in order to qualify for Medicare reimbursement for cataract surgery. Dr. LoCascio's witnesses also alleged that Dr. Roisman did not obtain truly informed consent from some cataract surgery patients.

Dr. Roisman put forth a contrary position. Through his own testimony, that of former patients, and the opinion of a professional Medicare auditor, Dr. Roisman explained that doctor re-testing and re-evaluation of visual acuity, especially under varying lighting that can affect a patient's degree of cataract impairment, is both common and well within the standard of professional care—and is not Medicare fraud nor the basis for a charge of unethical conduct. Dr. Roisman made the point that despite Dr. LoCascio's having given information about Dr. LoCascio's allegations of fraud by Dr. Roisman to the authorities, no civil or criminal action against HEA or Dr. Roisman had ever been taken, including the last 6 years while this lawsuit was pending—1994 to 2000.

Dr. Roisman also denied any improper coaching of patients and rejected the accusation that he had performed any unnecessary surgery. Dr. Roisman described the accomplishments of his practice, and proudly admitted to being a strong advocate for his patients. He rejected the suggestion that the complaining technicians had the right or ability to elevate their judgment as to a patient's acuity or need for surgery above Dr. Roisman's professional judgment and his experienced diagnostic and prescriptive decision-making.

With regard to Dr. LoCascio's charges against Dr. Roisman, then, the evidence and the conclusions to be drawn therefrom were about as polarized as could be imagined, presenting classic jury questions. As the continuation of this narrative will show, the jury that was empaneled in this case accepted the position that Dr. Roisman advanced at trial.

To return to the chronological narrative of the development of this case: several months following the meeting with the technicians, in January of 1994, Dr. LoCascio gave Dr. Roisman 2 weeks' notice that he, Dr. LoCascio, was leaving HEA. Dr. LoCascio also told Dr. Roisman that he was going to open his own ophthalmology practice in Huntington, approximately a mile and a half away from Dr. Roisman's main office. This news came as a complete surprise, according to Dr. Roisman.

Dr. Roisman thereafter sued Dr. LoCascio for breach of contract and tortious interference with business relations. Dr. Roisman sought damages in the amount of the contractually required stock purchase, or, in the alternative, the $650,000 (two times Dr. LoCascio's salary at the time of the alleged breach of contract) in liquidated damages that the contract called for in the event that Dr. LoCascio breached its terms. Dr. LoCascio counterclaimed against Dr. Roisman, asserting claims of tortious interference and constructive discharge. Dr. LoCascio claimed, *inter alia*, that Dr. Roisman had engaged in fraudulent and unethical conduct in connection with the HEA practice that excused any breach of contract by Dr. LoCascio.

The case proceeded to trial before a jury in January of 2000. Dr. Roisman, in his case-in-chief, described how he had founded and developed HEA, how he had recruited Dr. LoCascio, and how Dr. Roisman and Dr. LoCascio had negotiated Dr. LoCascio's contract of employment. Dr. Roisman explained that he had provided Dr. LoCascio with a "turn-key" practice, with a full complement of patients from his first day. Dr. Roisman testified that he had paid Dr. LoCascio a large salary (one million dollars), with full benefits, over 4 years. Dr. Roisman defended the 2–year non-compete clause as a mutually bargained-for protection for HEA against the financial consequences of losing a key employee, and then having that employee "set up shop" in the same area. Dr. Roisman put on evidence that Dr. LoCascio, shortly before he left HEA, had taken a copy of the HEA patient list, to which Dr. LoCascio had access while he was at HEA. Dr. Roisman testified that Dr. LoCascio, in his post-HEA practice, had been obtaining a substantial number of patient referrals from sources who had previously been referring patients to Dr. LoCascio at HEA. Dr. Roisman presented the testimony of an economist who concluded that HEA had lost a substantial amount of former HEA patient income as

a direct result of Dr. LoCascio's leaving HEA. The economist also concluded that Dr. Roisman had suffered monetary damages as a result of Dr. LoCascio's failure to purchase stock in HEA.

At the end of Dr. Roisman's case-in-chief, the circuit court decided that HEA's claim against Dr. LoCascio must fail as a matter of law for three basic reasons. The circuit court concluded that: (1) the geographic area of non-competition in Dr. LoCascio's contract was as a matter of law so over broad as to make the covenant not to compete unenforceable in any fashion; (2) the contractual requirement that Dr. LoCascio purchase stock in HEA was as a matter of law unenforceable because Dr. LoCascio had ceased to be a part of the HEA practice; and (3) the $650,000 liquidated damages provision was a penalty as a matter of law, and therefore was unenforceable.

However, the circuit court did not instruct the jury that the court was ruling against Dr. Roisman as a matter of law. Rather, in several related procedural rulings that we need not detail here, the circuit court allowed the trial to proceed and go to the jury on the parties' claims and defenses, for the purpose of making a complete appellate record. Pursuant to these procedural rulings, after Dr. Roisman presented his case-in-chief, Dr. LoCascio presented evidence in support of his counter-claims against Dr. Roisman. Dr. Roisman then presented evidence in rebuttal. The circuit court then allowed Dr. LoCascio to put on any additional evidence that he wished, including recalling witnesses, in defense to Dr. Roisman's claims against Dr. LoCascio.

A lengthy instructions conference produced a charge to the jury on the parties' claims and counterclaims and defenses. Neither appellant nor appellee has raised before this Court any argument that this jury charge was legally deficient or inaccurate; and our general review of the charge indicates that the charge fairly sets forth the applicable law on the parties' claims and defenses, and gave the jury its proper role in ruling on those claims and defenses. We need not discuss these in detail.

The jury was furnished with a verdict form that the parties also have not criticized in their briefs. The positions of the parties were ably argued to the jury by counsel. The jury returned the following verdict:

### JURY VERDICT FORM

1. We the jury find by a preponderance of the evidence that Joseph A. LoCascio, III, M.D. breached without justification the contract he had with Huntington Eye Associates, Inc.

Check one:

 √ \_\_\_\_
 YES NO

2. We the jury find by a preponderance of the evidence that Joseph A. LoCascio, III, M.D., tortiously interfered with the business of Huntington Eye Associates, Inc.

Check one:

 √ \_\_\_\_
 YES NO

If you have checked "YES" to any one or more of questions 1 or 2 above, give the amount of damages which you believe Huntington Eye Associates, Inc. should receive in compensation, if any. If you have checked "NO" to each question 1 and 2 above, then enter "–0–" and proceed directly to question 3 below.

$ 650,000

3. We the jury find by a preponderance of the evidence that Dr. Tully Roisman tortiously interfered with the contract by and between Huntington Eye Associates, Inc. and Dr. Joseph A. LoCascio, III, M.D.

Check one:

 \_\_\_\_ √
 YES NO

4. We the jury find by a preponderance of the evidence that Huntington Eye Associates, Inc. constructively discharged Joseph A. LoCascio, III, M.D.

Check one:

 \_\_\_\_ √
 YES NO

If you have checked "YES" to either question 3 or 4 above, and you believe that Joseph A. LoCascio, III, M.D. is entitled to compensation from Huntington Eye Associates, Inc., give the amount of damage you award, if any:

$ ———

After the jury returned its verdict, the circuit court entered an order dated May 2, 2000, from which the instant appeal is taken. That order directed a defense verdict for Dr. LoCascio on Dr. Roisman's claims, on the grounds that Dr. Roisman's case had failed as a matter of law. This order, in essence, set aside the jury verdict in favor of Dr. Roisman. Also, the jury having ruled against Dr. LoCascio on his counterclaim against Dr. Roisman, the circuit court did not disturb that ruling.

The circuit court also, in the alternative, awarded a new trial to Dr. LoCascio on Dr. Roisman's claims against Dr. LoCascio, on the grounds that Dr. LoCascio had not had a fair and full opportunity to defend against Dr. Roisman's claims.

## II.

■ We first consider whether the circuit court erred in ruling that Dr. Roisman's case failed as a matter of law. This was a purely legal ruling that we review *de novo*. Syllabus Point 3, *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996).

The circuit court's first ground for its ruling was that the geographic area of the foregoing-quoted non-competition clause in Dr. LoCascio's contract was as a matter of law geographically overbroad and thus unenforceable.

■ We need not go far afield to obtain the principles that govern the legal analysis of a covenant not to compete. In *Reddy v. Community Health Foundation of Man*, 298 S.E.2d 906, 171 W.Va. 368 (1982), former Justice Richard Neely authored a jurisprudential *tour de force* on this complex subject. The following syllabus points from the seminal opinion in *Reddy* direct our approach to the issues in the instant case:

2. An employee covenant not to compete is unreasonable on its face if its time or area limitations are excessively broad, or where the covenant appears designed to intimidate employees rather than to protect the employer's business, and a court should hold any such covenant void and unenforceable, and not undertake even a partial enforcement of it, bearing in mind, however, that a standard of "unreasonable on its face" is to be distinguished from the standard of "reasonableness" used in inquiries adopted by other authorities to address the minor instances of overbreadth to which restrictive covenants are naturally prone.

3. An inherently reasonable restrictive covenant is presumptively enforceable in its entirety upon a showing by the employer that he has interests requiring protection from the employee.

4. An employee may rebut the presumptive enforceability of a restrictive covenant by showing: (1) that he has no "trade assets" of the employer to convert; (2) that such "trade assets" as he has belong to him and not to the employer; (3) that the employer could be equally well protected by a narrowed covenant; or (4) that the employer has had time to recoup any extraordinary investment in the employee.

5. In an action for injunctive relief to enforce a restrictive covenant in an employment contract the burden of proving the inherent reasonableness of the restrictive covenant, and of showing a need for protection by it, is on the employer; the burden of proving that an inherently reasonable covenant should not be enforced in its entirety is on the employee.

In *Reddy*, this Court found that a covenant not to compete in a medical employment contract, with a 30–mile/3–year restriction, was not facially unreasonable as a matter of law. We remanded the case in *Reddy* for a factual determination as to whether the employer had proven a protectible interest that the covenant was reasonably designed to protect. We have stated that "[t]he existence of a [n employer's] protectible interest is a question of fact for a jury or trial court

sitting as a fact finder." *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983).

In a subsequent case, *Gant v. Hygeia Facilities Foundation, Inc.*, 181 W.Va. 805, 384 S.E.2d 842 (1989), we upheld a legal determination by a circuit court that a similar 30-mile/3-year covenant was not facially unreasonable. In *Gant* we also upheld the circuit court's factual determination that the employer had a protectible interest, and that the employee had not shown that the covenant should not be enforced in its entirety.

▮ In the instant case, Dr. Roisman had begun and built a business that provided specialized eye care over a wide geographic area, and he recruited extensively for doctors who would like to join in building such a business. As definitively evidenced by the language of the contract that is at issue in the instant case, Dr. Roisman specifically sought, in his recruiting efforts, doctors who would not abruptly leave HEA and go into direct competition with HEA in its market area.

The contract also definitively shows that Dr. LoCascio held himself out to be such a doctor. Dr. LoCascio specifically represented and promised to Dr. Roisman that Dr. LoCascio "[did] **not intend or desire to remain or practice medicine within the area professionally served by HEA**, if in fact [Dr. LoCascio did] not remain employed by HEA and if he [did not] purchase . . . equity stock interest in HEA[.]" (Emphasis added.) The contractual language and the other evidence at trial strongly suggest that Dr. Roisman would not have hired Dr. LoCascio, if Dr. LoCascio had not made such a promise.

Such a promise, of course, would mean little or nothing if it had no "teeth." Doctors, like lawyers and just about everyone else, understand that people's intentions and desires change. Therefore, to make it clear and to assure that he could be counted on to abide by and adhere to his stated intentions and desires, Dr. LoCascio also promised Dr. Roisman, in a solemnly binding fashion, that if Dr. LoCascio left HEA, Dr. LoCascio would abide by the specific non-compete provisions of the contract.[3] And Dr. LoCascio further promised to Dr. Roisman that Dr. LoCascio would pay specific and mutually-agreed-upon liquidated damages to Dr. Roisman, if Dr. LoCascio failed to honor those non-compete provisions.

Dr. LoCascio did not testify that he did not understand or did not intend to keep the promises that he made to Dr. Roisman. Dr. LoCascio's explanation at trial for his breach of those promises was rather that the breach was entirely caused, excused, and justified by Dr. Roisman's alleged unethical, fraudulent conduct.

The circuit court's order holding that the non-compete clause in the instant case was unenforceable focused on the court's conclusion that the existence of the several HEA "branch offices" resulted in an "area limitation [that is] excessively broad," Syllabus Point 1, *Reddy, supra*—by the circuit court's estimate, as much as 120 miles in one dimension.

▮ However, Dr. Roisman put on evidence that HEA drew significant numbers of patients from a wide area around the various HEA "branch offices."[4] The theoretical

---

3. "It is possible to imagine cases in which a worker is hopelessly overmatched in negotiations with his employer and is forced to sign a Draconian restrictive covenant, but those are not the facts of this case." *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 219, 314 S.E.2d 166, 175 (1983) (Neely, J., dissenting).

4. Justice Neely identified in *Reddy* the sort of protectible interests that employers may have that will justify an at least facially enforceable covenant not to compete:

The situations most likely to give rise to such an injury are those where the employer stands to lose his investment in employee training,

have his trade secrets or customer lists converted by the employee, *or have his market share threatened by the employee's risk-free entry into the employer's market*. These examples are not intended, however, as an exhaustive list; the central inquiry must always be the extent to which the employee may unjustly enrich himself by appropriating an asset of the employer for which the employee has not paid and using it against that very employer.

171 W.Va. at 378–379, 298 S.E.2d at 916 (emphasis added). Dr. Roisman testified that Dr. LoCascio obtained market share in part as a result of the contacts that Dr. LoCascio made while at HEA.

breadth of the contractually proscribed area, while a possible factor for a jury to consider in determining HEA's protectible interest, was not so broad as to be facially unreasonable—particularly in light of the fact that Dr. LoCascio, without first seeking any legal determination of his rights,[5] opened his competing office, not 51 miles from HEA's Huntington office, but less than 2 miles away.

We believe, consistent with this Court's approach in *Reddy* and *Gant*, that the circuit court erred in concluding that the non-compete provision of the commercial contract between these two sophisticated, well-represented professionals was facially overbroad and unenforceable as a matter of law.

The circuit court's second ground for directing a verdict against Dr. Roisman was based on the court's reasoning that the contract contemplated that Dr. LoCascio would purchase stock in HEA only if he was practicing there—so that when Dr. LoCascio left HEA, for whatever reason, Dr. Roisman could make no claim for damages against Dr. LoCascio based on Dr. LoCascio's failure to purchase stock. The circuit court concluded that changing circumstances at HEA, such as the departure of two other doctors, and ambiguities in the contract about the stock price made the stock purchase and related provisions unenforceable as a matter of law.

We agree that the stock purchase agreement contemplated that Dr. LoCascio would be practicing at HEA when he bought the stock. It is also correct that there were changes at HEA that would have justified modifying the "buy-in" terms, if Dr. LoCascio had in fact chosen to stay. Dr. Roisman testified that he had offered such modifications to Dr. LoCascio, and the evidence was that such modifications were being discussed, before the meetings with the technicians.

However, the analysis of the stock purchase agreement by the circuit court ignores the related matter of the liquidated damages provision of the contract, which the circuit court separately found to be an unenforceable penalty. When the stock purchase and liquidated damages provisions are considered

together, it is apparent that both Dr. Roisman and Dr. LoCascio understood from the outset that Dr. LoCascio might change his "intentions and desires," and choose to leave HEA without purchasing stock in HEA—and indeed, that Dr. LoCascio might also choose to go so far as not to honor the non-compete provisions of the contract.

[11] In such an event, the contractual language shows that Dr. Roisman and Dr. LoCascio understood that calculating the actual damages to HEA would be difficult, if not impossible. Considering the inherent complexity and uncertainty of such a calculation, this was an entirely reasonable understanding. Therefore, *both* Dr. Roisman *and* Dr. LoCascio agreed (and the point bears emphasis that both had something at stake in coming to this agreement, for the actual loss could well be greater or less) on a "two-years'-salary" figure, as a rough but fair estimate of what the loss to HEA would be.

 Our black-letter rule on liquidated damages provisions was stated in another "covenant-not-to-compete" case, *Wheeling Clinic v. Van Pelt*, 192 W.Va. 620, 453 S.E.2d 603 (1994):

3. "Parties may properly contract for liquidated damages (1) where such damages are uncertain and not readily capable of ascertainment in amount by any known or safe rule, whether such uncertainty lies in the nature of the subject, or in the particular circumstances of the case; or (2) where from the nature of the case and tenor of the agreement, it is apparent that the damages have already been the subject of actual fair estimate and adjustment between the parties."

4. "A clause for damages in a contract is a penalty rather than a liquidated damage provision when the amount is grossly disproportional in comparison to the damages actually incurred. This is true even though the provision is denominated as liquidated damages in the contract."

---

5. "A declaratory judgment action is a proper way for a restricted employee to test the enforceability of a noncompetition covenant in his or her

employment contract." *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 214, 314 S.E.2d 166, 170 (1983).

*Id.,* Syllabus Points 3 and 4 (citations omitted).

The circuit court found that while the 2–years'–salary liquidated damages clause set HEA's damages at $650,000, HEA's actual damages were less than half of that amount, according to HEA's expert—and therefore that the liquidated damages amount was "grossly disproportionate" to the actual damages to HEA.

However, this finding was based on a mischaracterization of the expert's testimony. HEA's expert testified that the lost income from patients who had been with HEA and who had gone to Dr. LoCascio after he left HEA accounted for a nearly $300,000 direct loss to HEA. But the loss to HEA from Dr. LoCascio's leaving HEA was not limited to the direct patient-shift costs imposed by Dr. LoCascio's competition; it also involved such elements as the foreseeable but difficult to calculate losses in overall HEA billings due to the abrupt loss of a physician in the practice—not to mention the lost income from the anticipated stock purchase. Dr. LoCascio testified that his billings in 4 years at HEA were $2.5 million.

The jury was instructed that if it found that the liquidated damages amount was unreasonably large and therefore punitive, the jury could in the alternative award actual damages. The jury decided, based on all of the evidence, that the liquidated damages were in fact reasonable.

Our review of the evidence leads us to the conclusion that a jury could conclude that these two well-represented professionals had arrived at a reasonable formula for estimating the damages to HEA that would occur if Dr. LoCascio breached his contractual promises, and the result of applying that formula was not grossly disproportionate to reality. Consequently, we conclude that the circuit court erred in directing a verdict for Dr. LoCascio on the latter two grounds that the court recited.

 The final issue that we must address is whether the circuit court erred in granting Dr. LoCascio a new trial on the grounds that Dr. LoCascio was unable to fully and fairly defend against Dr. Roisman's claims. We have reviewed the record and conclude that Dr. LoCascio was given a fair opportunity to put on all of the evidence and argument that he wished in both defense and offense. Dr. LoCascio took the stand twice to explain his position. At the end of the trial, Dr. LoCascio was given the right to call or re-call additional witnesses for either defensive or offensive purposes; and he was also offered a recess to consider strategy. Dr. LoCascio has not proffered any specific evidence that he says could have made a difference in the outcome of the jury's deliberations.

The jury had the law, the evidence, and the argument with which to assess the competing claims of the parties. Dr. LoCascio took the position that he did not, could not, and need not adhere to the contract's provisions because of alleged ethical, medical, and legal wrongdoing by Dr. Roisman. The jury simply did not accept that position.

 "The verdict of a jury will be held sacred by this Court, unless there is a plain preponderance of credible evidence against it, evincing a miscarriage of justice from some cause, such as prejudice, bias, undue influence, misconduct, oversight, or some misconception of the facts or law." Syllabus Point 1, *Young v. West Virginia & P.R. Co.,* 44 W.Va. 218, 28 S.E. 932 (1897).

### III.

Finally, we recognize and appreciate the careful, deliberate, and thorough consideration that the circuit court gave to the instant case. While our legal conclusions differ from those reached by the circuit court, this difference does not diminish our respect for the conscientiousness and professionalism of the court and counsel who tried the instant case.

For the foregoing reasons, we reverse the order of the circuit court directing a verdict for Dr. LoCascio on Dr. Roisman's claims against Dr. LoCascio, and granting Dr. LoCascio a new trial in the alternative. We remand the case to the circuit court for entry of judgment on the verdict returned by the jury.

Reversed and Remanded.