552 S.E.2d 406

**The Estate of Marjorie I. VERBA, by Sally Jo Nolan, Executrix, Appellant,**

v.

**David A. GHAPHERY, M.D., Appellee.**

**No. 27464.**

Supreme Court of Appeals of
West Virginia.

Submitted May 9, 2001.

Decided June 19, 2001.

Dissenting Opinion of Justice
Starcher July 10, 2001.

Dissenting Opinion of Justice
McGraw July 25, 2001.

Robert P. Fitzsimmons, Esq., Russell Jay Guthrie, Esq., Fitzsimmons Law Offices, Wheeling, West Virginia, Attorneys for Appellant.

Ancil G. Ramey, Esq., William E. Galeota, Esq., R. Christopher Anderson, Esq., Steptoe & Johnson, Charleston, West Virginia, Attorneys for Appellee.

Frederick M. Baron, Esq., Jeffrey R. White, Esq., Attorneys for Amicus Curiae The Association of Trial Lawyers of America.

P. Michael Pleska, Esq., Attorney for Amicus Curiae The West Virginia Chamber of Commerce.

Michael J. Farrell, Esq., Tamela J. White, Esq., Attorneys for Amici Curiae The West Virginia Hospital Association and The West Virginia Health Care Association.

Charles R. Bailey, Esq., John T. Molleur, Esq., Attorneys for Amicus Curiae The West Virginia Behavioral Healthcare Providers Association.

Thomas J. Hurney, Jr., Esq., Kenneth R. Landis, Jr., Esq. (Pro Hac Vice), Kyle G. French, Esq. (Pro Hac Vice), Attorneys for Amicus Curiae The National Association of Independent Insurers.

Michele Grinberg, Esq., C. Benjamin Salango, Esq., Attorneys for Amicus Curiae West Virginia State Medical Association.

G. David Brumfield, Howard M. Persinger, III, Brumfield & Watson, Charleston, for Amici Curiae Tonya Chapman, Johnny Chapman, John Cameron Chapman, Amanda Gail Lucas and David Scott Lucas.

PER CURIAM:

The appellant, the estate of Marjorie I. Verba, appealed from a decision of the Circuit Court of Ohio County which reduced her medical malpractice judgment from $2,821,000 to $1,020,510.51 as required by the medical malpractice cap set forth in W.Va. Code § 55–7B–8 (1986). On appeal, we were asked to revisit *Robinson v. Charleston Area Medical Center, Inc.*, 186 W.Va. 720, 414 S.E.2d 877 (1991), in which we unanimously upheld the constitutionality of the $1,000,000 cap on noneconomic damages awarded in medical malpractice cases. By opinion dated December 13, 2000, this Court affirmed the judgment of the circuit court and once again found the medical malpractice cap to be constitutional. The appellant subsequently petitioned for a rehearing, and the petition was granted. On reconsideration, we affirm the judgment of the circuit court and uphold the constitutionality of the cap.

## I.

### FACTS

Dr. Ghaphery performed anti-reflux surgery on sixty-eight-year-old Marjorie Verba on February 21, 1996. Ms. Verba remained in the hospital for four days following surgery. The parties dispute whether Ms. Verba was continuing to have medical problems at the time of her release on February 25, 1996. Within ten to twelve hours of discharge, Ms. Verba died. The results of an autopsy indicated that a surgical nick resulted in a laceration to the stomach, which in turn caused Ms. Verba to contract peritonitis and to die as a result.

The appellant brought a medical malpractice action against Dr. Ghaphery and a jury found for the appellant, awarding $300,000 for physical pain, mental pain, and loss of enjoyment of life; $21,000 for medical and funeral bills; and $2,500,000 to the beneficiaries of Ms. Verba's estate under the wrongful

death statute. *See* W.Va.Code § 55–7–6 (1992). As noted above, the trial court reduced the award to conform to the medical malpractice cap in W.Va.Code § 55–7B–8 (1986).

## II.

### STANDARD OF REVIEW

■ At the outset, we set forth the relevant principles which guide us in determining the constitutionality of legislative acts.

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965). Concerning the level of scrutiny to be applied to issues affecting economic rights, we have held:

Where economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally. Where such classification is rational and bears the requisite reasonable relationship, the statute does not violate Section 10 of Article III of the West Virginia Constitution, which is our equal protection clause.

Syllabus Point 7, *Atchinson v. Erwin,* 172 W.Va. 8, 302 S.E.2d 78 (1983) (as modified in Syllabus Point 4, *Gibson v. West Virginia Department of Highways,* 185 W.Va. 214, 406 S.E.2d 440 (1991)). We now discuss the specific issues before us.

## III.

### DISCUSSION

■ This Court held in Syllabus Point 5 of *Robinson v. Charleston Area Medical Center, Inc.,* 186 W.Va. 720, 414 S.E.2d 877 (1991):

*W.Va.Code,* 55–7B–8, as amended, which provides a $1,000,000 limit or "cap" on the amount recoverable for a noneconomic loss in a medical professional liability action is constitutional. It does not violate the state constitutional equal protection, special legislation, state constitutional substantive due process, "certain remedy," or right to jury trial provisions. *W.Va. Const.,* art. III, § 10; *W.Va. Const.* art. VI, § 39; *W.Va. Const.* art. III, § 10; *W.Va. Const.* art. III, § 17; and *W.Va. Const.* art. III, § 13, respectively.

Accordingly, we find no reason to revisit the constitutional issues previously raised in *Robinson.*[1] Rather, we believe that our prior ruling is subject to the judicial doctrine of *stare decisis* which rests on the principle,

that law by which men are governed should be fixed, definite, and known, and that, when the law is declared by court of competent jurisdiction authorized to construe it, such declaration, in absence of palpable mistake or error, is itself evidence of the law until changed by competent authority.

*Booth v. Sims,* 193 W.Va. 323, 350 n. 14, 456 S.E.2d 167, 194 n. 14 (1995) (citation omitted). Finding no palpable mistake or error in *Robinson,* we affirm that decision.

■ In addition, we note that the parties as well as *amici* presented copious statistics to this Court to either defend or refute the legislature's findings in support of the medi-

---

1. In the instant case, the appellant contends that the medical malpractice cap on noneconomic damages violates the equal protection clause, the separation of powers clause, the right to a trial by jury, the open court and certain remedy clauses, the due process clause, and the special act clause.

cal malpractice cap. However, we "ordinarily will not reexamine independently the factual basis for the legislative justification for a statute. Instead, the inquiry is whether the legislature reasonably could conceive to be true the facts on which the challenged statute was based." *Robinson,* 186 W.Va. at 730, 414 S.E.2d at 887 (citation omitted). Our review of the legislature's findings and declaration of purpose in W.Va.Code § 55–7B–1 (1986) leads us to conclude that the legislature reasonably could conceive to be true the facts on which the Medical Professional Liability Act, including the medical malpractice cap, is based. Further, we resolve any reasonable doubts on this question in favor of the constitutionality of the cap.

The appellant also avers that the cap violates the "separation of powers" doctrine, *see* W.Va. Const. art. V, § 1, a claim, according to the appellant, not specifically addressed in *Robinson.* The appellant argues that the cap effectively constitutes a legislative remittitur for any verdict that exceeds $1,000,000 in noneconomic damages. We find no merit in the appellant's argument.

 It is beyond dispute that the legislature has the power to alter, amend, change, repudiate, or abrogate the common law. This Court has recognized that "[b]y virtue of the authority of Article 8, Section [13][2] of the Constitution of West Virginia and of Code, 1931, 2–1–1 it is within the province of the legislature to enact statutes which abrogate the common law." Syllabus, *Perry v. Twentieth St. Bank,* 157 W.Va. 963, 206 S.E.2d 421 (1974) (footnote added). "[T]he indisputable fact [is] that the legislature has the power to change the common law of this State." *Gilman v. Choi,* 185 W.Va. 177, 186, 406 S.E.2d 200, 209 (1990), *overruled on other grounds as stated in Mayhorn v. Logan Med. Found.,* 193 W.Va. 42, 454 S.E.2d 87 (1994). *See also Robinson, supra; Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 408 S.E.2d 634 (1991); and *Wallace v. Wallace,* 155 W.Va. 569, 184

S.E.2d 327 (1971), *overruled on other grounds as stated in Belcher v. Goins,* 184 W.Va. 395, 400 S.E.2d 830 (1990).

In *Edmonds v. Murphy,* 83 Md.App. 133, 149, 573 A.2d 853, 861 (1990), *aff'd,* 325 Md. 342, 601 A.2d 102 (Md.1992), the Court of Special Appeals of Maryland recognized that the power to alter the common law includes "the power to set reasonable limits on recoverable damages in causes of action the legislature chooses to recognize." (Quoting *Franklin v. Mazda Motor Corp.,* 704 F.Supp. 1325, 1336 (1989)). The court reasoned "that if the legislature can, without violating separation of powers principles, establish statutes of limitation, establish statutes of repose, create presumptions, create new causes of action and abolish old ones, then it also can limit noneconomic damages without violating the separations of powers doctrine[.]" *Id.* We concur with this reasoning and acknowledge the power of the legislature to set reasonable limits on recoverable damages in civil causes of action.

The appellant next urges the Court to hold the cap invalid in order to provide the legislature with the opportunity to increase the cap based on fifteen years of inflation.[3] The appellant says that inflation has decreased the cap since its passage to a value of $648,147 in 1999 dollars, which is a decrease of more than 35 percent. Accordingly, says the appellant, the cap is no longer the $1,000,000 amount which the legislature intended upon its passage.

 We do not believe that the mere passage of time has rendered the medical malpractice cap unconstitutional or invalid. "Presumably the legislature was aware of the effects of inflation and could have opted for some cap indexed to inflation. That the legislature did not index the cap to inflation but set forth an absolute dollar amount does not render the cap unconstitutional." *Griffin v. Southeastern Pennsylvania Transp. Authority,* 757 A.2d 448, 453 (Pa.Commw.Ct.2000),

---

**2.** This syllabus point originally referenced Article VIII, § 21 of the state constitution which was the relevant section prior to the 1974 Judicial Reorganization Amendment.

**3.** The appellant notes that in response to inflationary erosion, some states have included built-in inflation mechanisms in their medical malpractice statutes. These states include Colorado, Idaho, Maryland, Missouri, and Virginia.

*appeal denied by Griffin ex rel. Estate of Griffin v. Southeastern Pennsylvania Transp. Authority,* 775 A.2d 810, 2001 WL 169571 (Pa. Feb.21, 2001). It is up to the legislature and not this Court to decide whether its legislation continues to meet the purposes for which it was originally enacted. If the legislature finds that it does not, it is within its power to amend the legislation as it sees fit. This Court "may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 692, 408 S.E.2d 634, 642 (1991) (citation omitted). Accordingly, we decline to find the cap invalid based on inflation.

Finally, the appellant asserts that attorney fees and costs should be awarded in medical malpractice actions where the verdict exceeds the cap. The appellant reasons that a successful malpractice plaintiff can never achieve the statutory limit on noneconomic damages of one million dollars because the award is subject to attorney fees and costs.

Our law recognizes that "[a]s a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement except when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." Syllabus Point 9, *Helmick v. Potomac Edison Co.,* 185 W.Va. 269, 406 S.E.2d 700 (1991). This Court has permitted an award of attorney fees where public officials deliberately disregarded mandatory statutory provisions, *see Richardson v. Town of Kimball,* 176 W.Va. 24, 340 S.E.2d 582 (1986); in a trespass action where the losing party intentionally encroached and personally removed boundary markers, *see Miller v. Lambert,* 196 W.Va. 24, 467 S.E.2d 165 (1995); where fraud was shown, *see Bowling v. Ansted Chrysler–Plymouth–Dodge,* 188 W.Va. 468, 425 S.E.2d 144 (1992); in an action against a fiduciary for mismanagement, *see Old Nat'l Bank of Martinsburg v. Hendricks,* 181 W.Va. 537, 383 S.E.2d 502 (1989); in an action to enforce an insurance contract, *see*

*Hayseeds v. State Farm & Cas.,* 177 W.Va. 323, 352 S.E.2d 73 (1986); and where an insurer unfairly failed to promptly settle a legitimate claim, *see Jenkins v. J.C. Penney Casualty Insurance Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds as stated in State ex rel. State Farm Fire & Cas. Co. v. Madden,* 192 W.Va. 155, 451 S.E.2d 721 (1994).

The difficulty with the appellant's position is that intentional and wrongful conduct, like that mentioned above, is not necessarily present in every case where a prevailing medical malpractice plaintiff is awarded noneconomic damages in excess of the statutory limit. As a result, many losing defendants in medical malpractice cases could be assessed attorney fees, not because of intentional wrongdoing, but simply because they chose to defend a claim and lost in the end. We have held:

> Bringing or defending an action to promote or protect one's economic or property interests does not *per se* constitute bad faith, vexatious, wanton or oppressive conduct within the meaning of the exceptional rule in equity authorizing an award to the prevailing litigant of his or her reasonable attorney's fees as "costs" of the action.

Syllabus Point 4, *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986). This holding is based on the principal that "[e]veryone who has a good faith dispute requiring a decision by an impartial arbiter is entitled to his day in court." *Yost v. Fuscaldo,* 185 W.Va. 493, 500, 408 S.E.2d 72, 79 (1991) (quoting *Nelson v. Public Employees Insurance Board,* 171 W.Va. 445, 454, 300 S.E.2d 86, 95 (1982)). Permitting attorney fee awards as urged by the appellant runs contrary to this principle.

In addition, the legislature was aware when it enacted the cap that damages awarded to prevailing plaintiffs in medical malpractice cases would be reduced by their attorney fees and costs. Nevertheless, the legislature did not enact a provision in the medical malpractice act permitting fees and costs to prevailing plaintiffs.

Finally, we are not convinced that a rule permitting attorney fees and costs is needed.

Our research indicates that this state's medical malpractice cap of $1,000,000, is one of the most liberal caps in the country. In fact, no state has a cap set at a higher amount. Accepting the fact that the cap now has only a present value of approximately $648,147, this amount is still greater than many of the states which limit medical malpractice awards.[4] Accordingly, we decline to permit attorney fees and costs in medical malpractice cases simply because a prevailing plaintiff's award exceeded the statutory cap.

## III.

## CONCLUSION

Based on the foregoing, we affirm our holding in *Robinson v. Charleston Area Medical Center, Inc.*, 186 W.Va. 720, 414 S.E.2d 877 (1991) upholding the constitutionality of the $1,000,000 cap imposed by W.Va.Code § 55–7B–8 (1986) on noneconomic damages awarded in medical malpractice cases. Further, we reject the appellant's claims that the cap is invalid because of inflationary erosion and that attorney fees and costs should be awarded in cases where noneconomic damages exceed the statutory cap. Accordingly, the decision of the Circuit Court of Ohio County is affirmed.

Affirmed.

Justice DAVIS concurs and reserves the right to file a concurring opinion.

STARCHER, Justice, dissenting:

(Filed July 10, 2001)

I believe that the $1,000,000.00 "cap" imposed by *W.Va.Code*, 55–7B–8 [1986] is a patent violation of the equal protection and certain remedy provisions of the *West Virginia Constitution.* This discriminatory statute arbitrarily treats similarly situated persons differently and unfairly, and often deprives severely injured plaintiffs a remedy by due course of law. A plaintiff who is injured by the negligence of anyone *other* than a "health care provider" can collect his or her full damages as awarded by a jury— but a plaintiff who is injured by the negligence of a "health care provider" cannot. Why should health care providers get more protection for their carelessness than others do as a vehicle driver, homeowner, or provider of other professional services?

I would again revisit the constitutionality of *W.Va.Code*, 55–7B–8, and invalidate the statute.

Marjorie I. Verba was, by all accounts, generally of good health for a 68–year–old woman. However, she occasionally had problems with "reflux," where the stomach contents flow backwards up into the esophagus. Most everyone has experienced this "heartburn" during their lifetime; it was a more routine problem for Ms. Verba.

Ms. Verba consulted with defendant David A. Ghaphery, and was told that surgery might help her problem. She was admitted to a hospital for laproscopic surgery to correct the reflux problem. During the surgery, the doctor would lift her stomach, and wrap a portion around the esophagus to create a natural valve that would stop the stomach's contents from back-flowing into the esophagus.

Surgery was performed on February 21, 1996, and Ms. Verba remained in the hospital for 4 days to recover. Ms. Verba had nausea and vomiting, a low grade fever, and would not eat. Prior to her discharge, one of her daughters spoke with Dr. Ghaphery by phone to tell the doctor she and her sister

---

4. For example, the cap on noneconomic damages in California is $250,000, *see* Cal. Civil Code § 3333.2(b) (1975); Kansas—$250,000, *see* Kan. Stat. Ann. § 60–19a02(b) (1988); Missouri—$350,000, *see* Mo. Ann. Stat. § 538.210 (1986); and Idaho—$400,000 (adjusted for inflation), *see* Idaho Code § 6–1603(1)(1987); In Virginia, the cap *on the total amount recoverable for any injury to, or death of, a patient* is 1.5 million dollars, to increase $50,000 a year after July 1, 2000, *see* Va.Code Ann. § 8.01–581.15 (1999). In Louisi-

ana, the total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits, is $500,000 plus interest and costs, *see* La.Rev.Stat. Ann. 40 § 1299.42B (1991). In Maryland, the cap on noneconomic damages in *all personal injury actions, not just medical malpractice actions,* was $500,000 on October 1, 1994 to increase by $15,000 on October 1 of each year following October 1, 1995, *see* Md.Code Ann., [Courts and Judicial Proceedings] § 11–108 (2000).

did not feel their mother was ready to go home, mainly because she was not holding her food down. Dr. Ghaphery screamed at her, and told her that her mother was okay to go home. Dr. Ghaphery did not return to the hospital to check on Ms. Verba, and she was discharged at 6:00 p.m.

Within 10 hours of her discharge, 5 days after her surgery, Ms. Verba was dead. An autopsy found an 8-millimeter laceration in the stomach caused by a surgical instrument during surgery. The stomach's contents seeped into the peritoneum causing peritonitis and septic shock which killed Ms. Verba.

A mistake happened during surgery; a jury concluded that the mistake constituted medical malpractice, and that Ms. Verba died as a result.

The jury awarded $300,000.00 for physical pain, mental pain, and loss of enjoyment of life; $21,000.00 for medical and funeral bills; and $2,500,000 to the beneficiaries of the estate for those items set forth in the wrongful death statute, *W.Va.Code*, 55–7–6. The trial court reduced the verdict to $1,020,510.51, because of the medical malpractice cap contained in *W.Va.Code*, 55–7B–8.

An economist, on behalf of the plaintiff-appellants, recently calculated that the $1,000,000.00 cap established in 1986 has a present day value in the year 2000 of only $624,898.00, due to the eroding effects of inflation.

This Court ruled in *Robinson v. Charleston Area Med. Ctr.*, 186 W.Va. 720, 414 S.E.2d 877 (1991), that the medical malpractice cap on damages was constitutional. However, the recent trend has been to find medical malpractice caps, and/or tort reform legislation in general, to be unconstitutional.[1] This Court should join that trend and find *W.Va.Code*, 55–7B–8 to be unconstitutional.

The defendants contend that the medical malpractice cap is necessary to keep the costs of medical liability insurance reasonable. When a statute purports to mitigate a certain, perceived problem—like unreasonably high medical malpractice insurance premiums—it is not rational for the legislature to impose the burden of fixing that problem on a particular class, when many other factors contribute to the problem. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313, 324 (1985). It is therefore irrational to impose upon people severely injured by one doctor's mistake the burden of reducing, by some immeasurable amount, all doctors' medical malpractice insurance premiums. This is particularly so when—as detailed below—many other factors contribute more significantly to higher premium costs.

In *Robinson* this Court concluded that the medical malpractice cap did not violate the Equal Protection Clause of the *West Virginia Constitution*, Article III, section 10. In reaching this conclusion, we cited to the proposition that economic regulations are entitled "wide judicial deference." 186 W.Va. at 729, 414 S.E.2d at 886. I disagree with this use of the proposition in the instant case, and believe that the right to recover personal injury damages is a significant substantive right requiring the application of some higher, perhaps intermediate, scrutiny. *See, e.g., Spilker v. City of Lincoln*, 238 Neb. 188, 192, 469 N.W.2d 546, 548 (1991); *Hanson v. Williams County*, 389 N.W.2d 319, 325 (N.D. 1986); *Heath v. Sears, Roebuck & Co.*, 123 N.H. 512, 524, 464 A.2d 288, 294–95 (1983). The intermediate scrutiny test is utilized when legislation substantially related to the achievement of an important governmental

---

1. *See Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978); *Smith v. Department of Ins.*, 507 So.2d 1080 (Fla.1987); *Lucas v. U.S.*, 757 S.W.2d 687 (Tex.1988); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711 (1989); *Condemarin v. Univ. Hosp.*, 775 P.2d 348 (Utah 1989); *Brannigan v. Usitalo*, 134 N.H. 50, 587 A.2d 1232 (1991); *Smith v. Schulte*, 671 So.2d 1334 (Ala.

1995); *Knowles v. United States*, 544 N.W.2d 183 (S.D.1996); *Best v. Taylor Machine Works*, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057 (1997); *Martin v. Richey*, 711 N.E.2d 1273 (Ind. 1999); *Lakin v. Senco Prod., Inc.*, 329 Or. 62, 987 P.2d 463 (1999); *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999).

interest has been challenged. *See Payne v. Gundy*, 196 W.Va. 82, 468 S.E.2d 335 (1996).

In the recent opinion of *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999), the Ohio Supreme Court struck down a group of Ohio statutes limiting damages, finding that it violated the state's equal protection and due process clauses. The Court stated:

> We are unable to find . . . any evidence to buttress the proposition that there is a rational connection between awards over [the cap] and malpractice insurance rates. There is evidence of the converse, however. The Supreme Court of Texas found no relationship between insurance rates and the cap, citing an independent study that showed that less than .6 of all claims brought were for more than $100,000. *Lucas v. United States*, (Tex.1988), 757 S.W.2d 687, 691. According to three *amici* arguing against the statute's constitutionality, a 1987 study by the Insurance Service Organization, the rate-setting arm of the insurance industry, found that the savings from various tort reforms, including a $250,000 cap on non-economic damages, were "marginal to nonexistent."

86 Ohio St.3d at 486, 715 N.E.2d at 1092 (citations omitted). Relying on this finding, the Ohio Court applied a higher degree of analysis to the cap on damages and found that it was "irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice," and that any cap on damages was "unconstitutional because it does not bear a real and substantial relation to public health or welfare and further because it is unreasonable and arbitrary." 86 Ohio St.3d at 486, 715 N.E.2d at 1092.

Ohio is not the only state to find that it violated equal protection guarantees to impose a "cap" on damages. The Alabama Supreme Court ruled its statute capping medical malpractice damages unconstitutional, citing to a study by the United States General Accounting Office that concluded that the connection between personal injury damage caps and the total cost of health care is remote. *Moore v. Mobile Infirmary Assn.*, 592 So.2d 156 (Ala.1991). New Hampshire, using an intermediate level of scrutiny, also found its statute unconstitutional. *See Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980); and *Brannigan v. Usitalo*, 134 N.H. 50, 587 A.2d 1232 (1991).

I believe that by balancing the direct and palpable burden placed upon catastrophically injured victims of medical malpractice against the indirect and speculative benefit that may be conferred on society, *W.Va.Code*, 55–7B–8 is an unreasonable exercise of the state's power. *See Moore v. Mobile Infirmary Assn.*, 592 So.2d at 157. I therefore believe that the malpractice cap violates our the equal protection guarantees of the *West Virginia Constitution*.

I also believe that the malpractice cap violates the "certain remedy" provisions of Article III, Section 17 of the *West Virginia Constitution*, that states:

> The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law.

The test announced in *Robinson* for determining whether legislation violates the "certain remedy" clause is a two-step process. First, the proponent of the statute must demonstrate the existence of a "clear social or economic problem" which requires the alteration of some common law right or remedy. Second, the legislative change of the common law right or remedy "must be a reasonable method of eliminating or curtailing the 'clear social or economic problem[.]'" *Robinson*, 186 W.Va. at 728, 414 S.E.2d at 885.

There is not now, nor has there ever been, a clear "social or economic problem" arising from medical malpractice in West Virginia. An insurance company's cry that it is losing money is more likely an admission of poor business practices, not a clear social or economic problem. An article by Barry Hill, "Ponzi Rides Again: The PIE Mutual Story," *WVTLA Advocate* (Fall 1998), details how one medical malpractice insurance company lost money, and subsequently folded, for reasons that had nothing to do with low premi-

um rates or high medical malpractice lawsuit verdicts.

In 1997, PIE Mutual sold medical malpractice insurance to 15,000 policyholders in nine states, including West Virginia. In December 1997, an Ohio judge placed the company in receivership, declaring the company to be hopelessly insolvent with claims exceeding assets by $275 million. The Ohio Department of Insurance found, during PIE's liquidation, that PIE had an $11.6 million payroll for 150 employees, an average of more than $77,000.00 per employee. Salaries consumed 25% of all premiums paid by PIE's insured physicians, salaries 4.5 times the national average. Travel expenses were $2.6 million—4.7% of premiums—an average of $17,000.00 per employee.

Five months before PIE was liquidated, the company gave $11.8 million to three of its top executives. Of $6.1 million received by the CEO, $92,000.00 went to a cattle purchase from a member of the CEO's family, $95,000.00 was paid to MGM Gaming, and $30,000.00 went to RIO Casino. And the bonuses didn't stop there.

The CEO's son, who was the vice president of marketing, got an $8,000.00 salary advance from PIE—an advance that was never repaid. The CEO's secretary got a $48,000.00 salary bonus; one vice president got a $264,000.00 bonus, another a $160,000 bonus. An accountant got an extra $132,000.00, while the assistant controller got $67,000.00. Meanwhile, the vice president of claims had a $350,000.00 loan forgiven.

Not all the money went into the pockets of employees. From 1992 until 1997, PIE paid $1.4 million to a board member for "consulting." The company also gave money to the Republican Party, nearly $300,000.00 between 1994 and 1996. It also paid $50,000.00 toward the cost of remodeling the Ohio Republican Headquarters. PIE executives underwrote the $35,000.00 cost of the Southern Legislative Conference in Charleston in June 1996, and gave $13,000.00 to five West Virginia legislative candidates in 1996. It is unclear how much PIE spent on its luxury Skybox at Jacob's Field in Cleveland, home of the Cleveland Indians, but a contingent of politicians from West Virginia were hosted in the box as late as 1997.

In June 1998, the Ohio Department of Insurance auctioned off many of PIE's assets to pay its claims. At PIE's Cleveland headquarters, it auctioned off china and crystal services for 60, as well as a rare Frederick Remington lithograph collection. The Board of Director's conference table alone sold for $30,000.00. It also auctioned off "TidePoint," an exclusive 63–acre Hilton Head retirement complex, 80% owned by PIE, for $23.7 million. The facility, with condominiums and villas ranging in price from $166,000.00 to $606,000.00, was coincidentally the home of the CEO's parents.

There is not now, nor has there ever been, a "medical malpractice" crisis. The premiums for malpractice insurance are high—but as the PIE situation demonstrates, often for reasons wholly unrelated to malpractice verdicts. Still, physicians should expect malpractice premiums to be high because of the risk—Dr. Ghaphery performed "routine" surgery on Ms. Verba, and 5 days later she was dead because of an unnoticed slip of the scalpel. Where the risk is high, and the costs of error high, the price for insuring against that risk should be high—and certainly does not qualify as a "social or economic problem" such that access to the courtroom should be restricted.

It violates the right of every citizen to arbitrarily eliminate the citizen's right to a full and complete remedy from a wrongdoer.[2]

2. For an example of a remedy from a wrongdoer, one need look no further than *Huntington Eye Associates v. LoCascio,* 210 W.Va. 76, 553 S.E.2d 773 (2001) (*per curiam*). In that case, the Court returned to a plaintiff a jury's verdict worth, with interest, nearly a million dollars—and the plaintiff was a doctor suing another doctor for breach of contract. The plaintiff doctor said he had an agreement that the defendant doctor would either work for him, or in the alternative, would not open an office within 50 miles of the plaintiff's office for 2 years. The defendant doctor said the plaintiff was routinely committing Medicare fraud by performing unnecessary surgery, and so left the plaintiff's employ to open an office less than 2 miles away. We held that on these disputed positions, a jury was best equipped to decide which doctor was in the right, and which remedy would best compensate the offended doc-

A jury is best equipped to determine who is in the right and who is in the wrong, and to decide a "remedy by due course of law." The *West Virginia Constitution* guarantees this right; the majority opinion gives it short shrift.

I believe that, by any measure, the medical malpractice cap contained in *W.Va.Code*, 55–7B–8 is arbitrary, unfair, and unconstitutional. I therefore respectfully dissent.

McGRAW, Chief Justice, dissenting:

(Filed July 25, 2001)

This Court should more closely re-evaluate its earlier decision in *Robinson v. Charleston Area Medical Center, Inc.*, 186 W.Va. 720, 414 S.E.2d 877 (1991), which in my view failed to discern obvious constitutional infirmities in the $1 million cap imposed by W. Va.Code § 55–7B–8 on non-economic damages awarded in medical malpractice cases. The statute fails to pass constitutional muster on at least two grounds.[1]

First, the limitation on non-economic damages denies equal protection by discriminating among tort victims in such way as to deny recovery to the most egregiously injured. The *Robinson* Court prefaced its analysis of the equal protection challenge to W. Va.Code § 55–7B–8 by stating that " '[a] statutory limitation on [a common-law measure of] recovery is simply an economic regulation, which is entitled to wide judicial deference.' " 186 W.Va. at 729, 414 S.E.2d at 886 (quoting *Etheridge v. Medical Center Hosp.*, 237 Va. 87, 99, 376 S.E.2d 525, 531 (1989)). Several state courts have, however, recognized that the right to recover for personal injury is a significant substantive right requiring application of intermediate scrutiny or equivalent approaches. *See, e.g., Spilker v. City of Lincoln*, 238 Neb. 188, 469 N.W.2d 546, 548 (1991); *Hanson v. Williams County*, 389 N.W.2d 319, 325 (N.D.1986); *Heath v. Sears, Roebuck & Co.*, 123 N.H. 512, 464 A.2d 288, 295 (1983). I would have this Court overrule *Robinson* on this point and join those jurisdictions that apply a heightened level of equal-protection scrutiny to statutory limitations on the right of injured persons to recover tort damages from otherwise liable parties. Specifically, the Court should apply intermediate scrutiny, where it must be shown that the challenged legislation is substantially related to the achievement of an important governmental interest. *See Payne v. Gundy*, 196 W.Va. 82, 468 S.E.2d 335 (1996) (applying intermediate scrutiny to gender discrimination case); *Israel by Israel v. W. Va. Secondary Schools Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989) (same); *Shelby J.S. v. George L.H.*, 181 W.Va. 154, 381 S.E.2d 269 (1989) (applying intermediate level of scrutiny to case involving illegitimacy).

Under such analysis, it is inconceivable that § 55–7B–8 would pass constitutional muster. As other courts have observed, statutes imposing a "one-size-fits-all" limitation on damages (economic or non-economic) create classifications based upon severity of injury, and then proceed to penalize those who are more seriously injured by denying them compensation beyond the statutory limit:

[T]he burden imposed by [a statute limiting non-economic damages in medical malpractice cases] on the rights of individuals

---

tor. The circuit court had taken away the plaintiff's verdict; we gave the verdict back.

It is unsettling to see this Court hold that two doctors can sue one another for millions of dollars in speculative contractual damages—yet at the same time, hold that an injured plaintiff can constitutionally be restricted from suing a doctor for the same amounts.

1. Appellant, as well as *amicus curiae* The Association of Trial Lawyers of America, also present a persuasive argument that § 55–7B–8 runs afoul of the right to a jury trial provided by Article III, § 13 of the West Virginia Constitution. *See, e.g., Lakin v. Senco Prod., Inc.*, 329 Or. 62, 987 P.2d 463 (1999) (invalidating $500,000 cap on non-economic damages based upon interference with constitutional right to trial by jury); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711 (1989) (finding that statutory limit on compensatory noneconomic damages violated state constitutional right to trial by jury). But, as appellee rightly points out, the present case involves a statutory cause of action for wrongful death, which falls outside the ambit of this constitutional provision. *See Simms v. Dillon*, 119 W.Va. 284, 193 S.E. 331 (1937) (holding that Article III, § 13 does not guarantee the right to trial by jury in any circumstance where it did not exist at common law), *overruled on other grounds, State Road Comm'n v. Milam*, 146 W.Va. 368, 120 S.E.2d 254 (1961).

to receive compensation for serious injuries is direct and concrete. The hardship falls most heavily on those who are most severely maltreated and, thus, most deserving of relief. Unlike the less severely injured, who receive full and just compensation, the catastrophically injured victim of medical malpractice is denied any expectation of compensation beyond the statutory limit. Moreover, the statute operates to the advantage not only of negligent health care providers over other tortfeasors, but of those health care providers who are *most irresponsible.*

*Moore v. Mobile Infirmary Ass'n,* 592 So.2d 156, 169 (Ala.1991) (emphasis in original). The Supreme Court of New Hampshire echoed this reasoning, noting that

[i]t is clear that the cap on damage recovery distinguishes not only between malpractice victims and victims of other torts but also "between malpractice victims with non-economic losses that exceed $250,000 and those with less egregious non-economic losses." ... We agree with the North Dakota Supreme Court that

"the limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does nothing toward the elimination of nonmeritorious claims. Restrictions on recovery may encourage physicians to enter into practice and remain in practice, but do so only at the expense of claimants with meritorious claims."

*Arneson v. Olson,* 270 N.W.2d [125,] 135–36 [ (N.D.1978) ]. It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation.

*Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 836–37 (1980) (citation omitted); *see also Best v. Taylor Mach. Works,* 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1069–78 (1997) (holding that $500,000 limit on noneconomic damages violated constitutional prohibition against special legislation, because, *inter alia,* "the statute discriminates between slightly and severely injured plaintiffs, and also between tortfeasors who cause severe and moderate or minor injuries"); *Smith v. Schulte,* 671 So.2d 1334, 1336–44 (Ala.1995) (finding that statute limiting the amount recoverable in a wrongful death action against a health care provider to $1,000,000 violated the equal protection guarantee of the Alabama Constitution).

I agree fully with Chief Justice Bird's dissent in *Fein v. Permanente Medical Group,* 38 Cal.3d 137, 695 P.2d 665, 211 Cal.Rptr. 368 (en banc), where she stated:

There is no logically supportable reason why the most severely injured malpractice victims should be singled out to pay for social relief to medical tortfeasors and their insurers. The idea of preserving insurance by imposing huge sacrifices on a few victims is logically perverse. Insurance is a device for spreading risks and costs among large numbers of people so that no one person is crushed by misfortune.... In a strange reversal of this principle, the statute concentrates the costs of the worst injuries on a few individuals.

38 Cal.3d at 173, 211 Cal.Rptr. at 393–94, 695 P.2d at 689–90 (Bird, C.J., dissenting). Accordingly, given the obvious existence of alternatives to § 55–7B–8 that impose far less hardship on the most egregiously injured victims of medical malpractice, I would find that the statute violates the equal protection guarantees contained in Article III, § 10 of the West Virginia Constitution, as well as the prohibition against special legislation set forth in Article IV, § 39.

For similar reasons, the statute also runs afoul of the "certain remedy" provision contained in Article III, § 17 of the West Virginia Constitution. In *Robinson,* the Court rejected this reasoning, finding that § 55–7B–8 was constitutional under the test previously formulated in syllabus point 5 of *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 408 S.E.2d 634 (1991):

"When legislation either substantially impairs vested rights or severely limits existing procedural remedies permitting court adjudication, thereby implicating the certain remedy provision of article III, section 17 of the Constitution of West Virgi-

nia, the legislation will be upheld under that provision if, first, a reasonably effective alternative remedy is provided by the legislation or, second, if no such alternative remedy is provided, the purpose of the alteration or repeal of the existing cause of action or remedy is to eliminate or curtail a clear social or economic problem, and the alteration or repeal of the existing cause of action or remedy is a reasonable method of achieving such purpose."

Syl. pt. 3, *Robinson, supra* (quoting *Lewis* ). As one commentator has correctly perceived, the *Lewis/Robinson* approach does no more than "impose a minimal 'rationality requirement' on the state legislature to justify the diminishment of the common law remedy." Jennifer Friesen, *State Constitutional Law* § 6–3(c)(1), at 358 (2d ed.1996).

In my estimation, the present standard does not give proper heed to the important constitutional interests at stake when an existing remedy is substantially altered by the Legislature. Instead, the proper standard that should be employed in this circumstance requires that such restrictive legislation must either provide a *quid pro quo* or reasonable alternative remedy, or it must be shown that abolishment or modification of the substantive right is required in order to achieve an important public objective, and the means chosen by the Legislature must be substantially related to achieving that purpose. *See Smith v. Department of Ins.*, 507 So.2d 1080, 1088–89 (Fla.1987) (per curiam) (invalidating $450,000 cap on noneconomic damages recoverable in tort based upon Florida's constitutional guarantee of access to court for redress of injury, where "overpowering public necessity" not demonstrated); *Kansas Malpractice Victims v. Bell,* 243 Kan. 333, 757 P.2d 251, 262–64 (1988) (finding that $1 million limit on medical malpractice recovery, with $250,000 cap on noneconomic damages, offended constitutional right to "remedy by due course of law," where no *quid pro quo* provided); *see also State ex rel. Oatl v. Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062, 1092 n. 14 (1999) (suggesting that heightened scrutiny would be applied to claim that cap violated due course of law provision if it were

found that right to jury trial were implicated). I would overrule *Robinson* and its precursors on this issue, and, at the very least, remand the present case for the development of a factual record pertinent to determining whether § 55–7B–8 passes scrutiny under this revised standard.

The Court in this case has chosen to ignore these deficiency in *Robinson,* and instead retreat behind the doctrine of *stare decisis.* While this Court obviously has an institutional responsibility to be consistent in its enunciation of the law, it should never be deterred from rectifying previous errors that implicate significant personal rights:

"No legal principle is ever settled until it is settled right. . . . 'Where vital and important public and private rights are concerned, and the decisions regarding them are to have a direct and permanent influence upon all future time, it becomes the duty as well as the right of the court to consider them carefully, and to permit no previous error to continue, if it can be corrected.' "

*Sizemore v. State Workmen's Compensation Com'r,* 159 W.Va. 100, 108, 219 S.E.2d 912, 916 (1975) (citation omitted). Moreover, where the pertinent question involves a determination of the scope of the protections set forth in our state constitution's Bill of Rights, the Court should never be deterred from ultimately reaching the correct result. *See Fry v. United States,* 421 U.S. 542, 559, 95 S.Ct. 1792, 1801, 44 L.Ed.2d 363 (1975), (Marshall, J., dissenting) ("important decisions of constitutional law are not subject to the same command of *stare decisis* as are decisions of statutory questions") (citations omitted).

For the foregoing reasons, I respectfully dissent.[2]

---

2. The majority has chosen to address the issue of

whether attorney's fees and costs may be recov-

ered where the jury's verdict exceeds the cap. While I believe that the cap on noneconomic damages gives defendants an incentive to be intransigent and drive up the costs of litigation in an effort to dissuade plaintiffs from pursuing legitimate claims, and would therefore permit plaintiffs to recover reasonable attorney's fees and costs when a jury awards the maximum amount permissible under the cap, this issue was never presented to the court below. As has frequently been emphasized, "[t]his Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syl. pt. 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958). Consequently, such issue should not have been addressed by this Court, and its present treatment is nothing more than dictum.