IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-454

Filed 20 August 2025

Buncombe County, No. 21 CVS 002884-100

ALLISON SWEENEY MOHEBALI, Plaintiff,

v.

JOHN DAVID HAYES, M.D., AND HARVEST MOON WOMEN'S HEALTH, PLLC, Defendants.

Appeal by plaintiff from judgment entered 8 December 2023 by Judge Steven R. Warren in Buncombe County Superior Court Heard in the Court of Appeals 26 February 2025.

*Ballew Puryear PLLC, by Matthew D. Ballew and Zachary R. Kaplan, and Ward and Smith P.A., by Jeremy Wilson, Alexander C. Dale, Taylor Rodney Marks, W. Ellis Boyle, and Joseph T. Knott, III, for plaintiff-appellant.*

*John David Hayes, MD, Pro Se for defendants-appellees.*

*No brief filed for defendants-appellees.*

*Nelson Mullins Riley & Scarborough, LLP, by D. Martin Warf, court-assigned amicus curiae counsel.*

*Shook, Hardy & Bacon L.L.P., by Caroline M. Gieser, for amici curiae American Property Casualty Insurance Association, Chamber of Commerce of the United States of American, and American Tort Reform Association.*

*Robinson, Bradshaw & Hinson, P.A., by Matthew W. Sawchak, Robert E. Harrington, Erik R. Zimmerman, and Caroline H. Reinwald, for amici curiae North Carolina Medical Society, The Charlotte Mecklenburg Hospital Authority d/b/a Atrium Health, Wake Forest University Baptist Medical Center d/b/a Atrium Health Wake Forest Baptist, CarolinaEast Health System, Duke University Health System, Inc., University Health Systems of Eastern Carolina, Inc. d/b/a ECU Health, North Carolina Chapter of the*

*American Society for Healthcare Risk Management, Inc., NCHA, Inc., d/b/a North Carolina Healthcare Association, North Carolina Health Care Facilities Association, Novant Health, Inc., University of North Carolina Health Care System, and WakeMed.*

*Parker Poe Adams & Bernstein LLP, by Stephen V. Carey and Aislinn R. Klos, for amici curiae North Carolina Chamber Legal Institute, North Carolina Association of Defense Attorneys, North Carolina Farm Bureau Federation, Inc., North Carolina Home Builders Association, and North Carolina Retail Merchants Association.*

*Higgins Benjamin, PLLC, by Robert Neal Hunter, Jr., and Jeanette K. Doran, for amici curiae North Carolina Institute for Constitutional Law and League for Civil Engagement, Inc.*

DILLON, Chief Judge.

Plaintiff Allison Sweeney Mohebali brought this medical malpractice action against her obstetrician, John David Hayes, and his medical clinic, Harvest Moon Women's Health, PLLC, (collectively, "Defendants") for *ordinary* negligence arising from his care of Plaintiff during her pregnancy. Plaintiff's pregnancy ended with an emergency c-section following fetal demise in Plaintiff's 44th week of gestation, well past the normal 40-week gestation period.

The issue in this appeal concerns whether a legislative cap imposed by the trial judge on Plaintiff's noneconomic damages awarded by the jury violates Plaintiff's right to a jury trial under Article I, Section 25 of our North Carolina Constitution.

## I.    Background

Defendants did not answer Plaintiff's complaint and otherwise did not provide

any defense at trial or in this appeal. Plaintiff's allegations in her complaint were, therefore, deemed admitted by Defendants. *See* N.C. R. Civ. P. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damages, are admitted when not denied in the responsive pleading.").

Prior to trial, the trial court granted partial summary judgment for Plaintiff, concluding that Plaintiff was entitled to judgment as a matter of law as to Defendants' *liability* for negligence. Accordingly, the only issue presented at trial was damages.

Plaintiff's allegations in her complaint and her evidence offered at the summary judgment hearing and at trial tend to show as follows:

Plaintiff became pregnant in late 2018 and desired to give birth in her home. She put herself in the care of Dr. Hayes, who specialized in home deliveries. Dr. Hayes assured Plaintiff "he would be able to immediately transfer [her] to a physician specializing in high-risk pregnancies or to the hospital if medical risks arose[.]"

Plaintiff's due date was 7 July 2019, based on a gestation period of 40 weeks. However, when Plaintiff did not naturally go into labor by her due date, Dr. Hayes told her to be patient. Over the next few weeks, Plaintiff and her husband raised concerns with Dr. Hayes about the prolonged pregnancy, but Dr. Hayes assured them there was nothing to worry about.

The risk of harm or death to the baby and harm to the mother rises precipitously after 42 weeks of gestation. At no time, however, did Dr. Hayes explain the risks to Plaintiff of carrying a baby well past the due date.

At the end of July, after Plaintiff reached 43 weeks, she was experiencing fever and intense pain, was not thinking clearly, and was having urinary incontinence. She asked Dr. Hayes if she should go to the hospital. Dr. Hayes, though, told Plaintiff he was not concerned and he would make sure she gave birth at home.

On the 1st of August, when Plaintiff's gestation period reached 43 weeks and 4 days and her condition was worsening, Dr. Hayes spent ten hours at Plaintiff's home. Plaintiff told Dr. Hayes she thought she should go to the hospital, as she was feeling ill and experiencing urinary incontinence and confusion. But he counseled her not to go and that inducing labor would not be the correct approach. He checked the baby's heartbeat, which was steady. He told her he would return the next day.

The next morning, when the gestation period reached 43 weeks and 5 days, Dr. Hayes arrived at Plaintiff's home. He was unable to detect the baby's heartbeat. He directed Plaintiff to his office where he confirmed Plaintiff's baby had died. Plaintiff was transported to a hospital, where the death of her baby was confirmed. Plaintiff had a c-section performed, and her deceased baby was removed from her body.

Unknown to Plaintiff, four years prior, in 2015, Dr. Hayes had entered a consent order with the North Carolina Medical Board in which he admitted to violating the applicable standard in his care of four patients, each resulting in the death of a baby. In that 2015 Consent Order, Dr. Hayes agreed he would refer any patient experiencing a high-risk pregnancy, including any patient reaching 42 weeks of gestation, to a maternal fetal medicine specialist for consultation, specifically that:

> Dr. Hayes shall refer all high risk pregnancy patients to a maternal fetal medicine specialist for a consultation. For purposes of this consent order, "high risk" is defined as a patient having . . . gestational age less than 36 weeks *or greater than 42 weeks . . . .*

(Emphasis added.)

Also unknown to Plaintiff, in July 2019, when she was in her 42nd week of gestation and in Dr. Hayes's care, Dr. Hayes entered *another* consent order with the Medical Board in which he admitted failing to comply with the 2015 Consent Order by failing to refer high-risk pregnancies on two occasions and where he agreed to no longer provide any obstetrical/gynecological services, effective 1 September 2019.

In sum, Dr. Hayes was in knowing violation of his 2015 Consent Order by failing to refer Plaintiff to another doctor once her gestation period reached 42 weeks. He instead chose to continue his care of Plaintiff for another twelve days, resulting in the death of Plaintiff's baby. Also, as a result of Dr. Hayes's actions, Plaintiff suffered physical and emotional harms, some of which are permanent in nature.

In her complaint and at trial, Plaintiff sought recovery *only* for her noneconomic, actual damages (e.g., pain and suffering) and *not* for her economic, actual damages (e.g. hospital bills) or for punitive damages. Based on Plaintiff's evidence, the jury awarded Plaintiff $7,500,000.00 in actual, noneconomic damages. The trial court reduced the jury's award to $656,730.00 pursuant to N.C.G.S. § 90-21.19(a), which caps awards for noneconomic damages caused by ordinary negligence in the medical malpractice context. Section 90-21.19(a) states in pertinent part:

> Except as otherwise provided in subsection (b) of this section, in any medical malpractice action in which the plaintiff is entitled to an award of noneconomic damages, the total amount of noneconomic damages for which judgment is entered against all defendants shall not exceed [$656,730.00]. Judgment shall not be entered against any defendant for noneconomic damages in excess of [$656,730.00] for all claims brought by all parties arising out of the same professional services.

N.C.G.S. § 90-21.19(a) (hereinafter the "Legislative Cap").[1] Plaintiff appeals.

## II. Analysis

The Legislative Cap, enacted by our General Assembly in 2011, provides a ceiling on the amount a plaintiff injured by medical malpractice may recover for noneconomic damages (e.g., pain and suffering), notwithstanding a jury's finding that said damages suffered were higher. *See id.*

On appeal, Plaintiff argues the Legislative Cap is unconstitutional, violating her right to a jury trial under Article I, section 25 of our North Carolina Constitution. Plaintiff makes no other legal arguments in this appeal challenging the trial court's application of the Legislative Cap reducing the jury's verdict. Defendants have provided no brief in this appeal. However, due to the importance of the issue raised, we have accepted amicus briefs to argue for and against Plaintiff's position.

We note, pursuant to subsection (b) of the Legislative Cap statute, the cap on

---

[1] The Legislative Cap was enacted in 2011, capping noneconomic damages in medical malpractice actions to $500,000.00 for that year. Pursuant to the law, the Cap resets every three years based on the change in the consumer price index. The maximum allowable damages for this present matter under the Cap is $656,730.00.

damages does *not* apply to certain verdicts in medical malpractice actions; for instance, the cap does not apply where the "trier of fact" finds both that the plaintiff suffered a *permanent* injury and that said permanent injury was suffered as a result of the defendant's *gross* negligence. N.C.G.S. § 90-21.19(b). We further note that in this matter, however, Plaintiff, through her counsel, has made no argument the Legislative Cap should not apply in her case based on this exception provided in subsection (b). Plaintiff, through her counsel, does allege she suffered "permanent injury"; her evidence, including an expert opinion, tends to show she suffers "permanent injury"; and the jury was instructed on "permanent injury" as an element of Plaintiff's noneconomic damages. However, Plaintiff, through her counsel, has made no allegation nor made any argument that Dr. Hayes's acts in caring for her well past 42 weeks of gestation in knowing violation of the 2015 Consent Order rose to the level of *gross* negligence as a legal theory to avoid the application of the Legislative Cap to the jury's verdict. Further, Plaintiff, through her counsel, has made no claim that she is entitled to punitive damages based on Dr. Hayes's actions. *See* N.C.G.S. § 90-21.19(c)(2) (stating the Legislative Cap does not affect award of punitive damages under Section 1D-15); N.C.G.S. § 1D-15(a)(3) (stating punitive damages are available where the defendant's acts are "willful or wanton").

It appears Plaintiff's evidence were sufficient to bring the matter within subsection (b) of the Legislative Cap statute. Had Plaintiff, through her counsel, preserved and made arguments and the jury had found that Plaintiff had suffered

permanent injury due to gross negligence by Dr. Hayes, the trial court would not have had the authority under the Legislative Cap statute to reduce the jury's award.

Plaintiff, through her counsel, though, chose to proceed solely with a claim for noneconomic damages based on *ordinary* negligence, thereby putting at issue the constitutionality of the Legislative Cap. Therefore, the only question properly before us is whether the Legislative Cap violates Article I, Section 25 of our North Carolina Constitution, which provides:

> In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of the people, and shall remain sacred and inviolable.

N.C. Const. Art. I, § 25.

The issue presented appears to be one of first impression in North Carolina. However, other states have grappled with whether a legislative cap on noneconomic damages violates the right to a jury trial under their respective state constitutions.

Many state supreme courts have recognized the authority of their respective legislatures to enact such caps as not violative of the right to a jury trial in common law actions. *See, e.g., Pulliam v. Coastal Emergency Servs. of Richmond, Inc.*, 509 S.E.2d 307 (Va. 1999); *Verba v. Ghaphery*, 552 S.E.2d 406 (W. Va. 2001); *Murphy v. Edmonds*, 601 A.2d 102 (Md. 1992); *Evans ex rel. Kutch v. State*, 56 P.3d 1046 (Alaska 2002); *Gourley ex rel. Gourley v. Nebraska Methodist Health Sys., Inc.*, 663 N.W.2d 43 (2003) (Neb. 2003); *Phillips v. Mirac, Inc.*, 685 N.W.2d 174 (Mich. 2004); *Kirkland*

*v. Blaine Cnty. Med. Ctr.*, 4 P.3d 1115 (Idaho 2000); *English v. New England Med. Ctr., Inc.*, 541 N.E.2d 329 (Mass. 1989); *Judd v. Drezga*, 103 P.3d 135 (Utah 2004).

Other state supreme courts, however, have held their respective legislatures lack the authority to cap a plaintiff's actual damages found by a jury, as violative of a state constitutional right to a jury trial in common law actions. *See, e.g., Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 691 S.E.2d 218 (Ga. 2010); *Moore v. Mobile Infirmary Ass'n*, 592 So.2d 156 (Ala. 1991); *Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633 (Mo. 2012); *Hilburn v. Enerpipe Ltd.*, 442 P.3d 509 (Kan. 2019); *Sofie v. Fibreboard Corp.*, 771 P.2d 711 (Wash. 1989).

The briefs representing each side have presented compelling arguments supporting their respective positions, many of which were litigated in the above cases in other states. And we invite our Supreme Court to weigh in on this issue. However, as the case is currently before our Court, we must decide the issue presented.

Our Supreme Court has recently reiterated an appellate court's role when considering the constitutionality of a statute enacted by our General Assembly:

> In reviewing the constitutionality of this statute, we must presume that it is constitutional. Furthermore, we may strike it down only if it violates the express constitutional text and its unconstitutionality is demonstrated beyond a reasonable doubt. Every constitutional inquiry examines the text of the relevant provision, the historical context in which the people of North Carolina enacted it, and this Court's precedents interpreting it.

*State v. Chambers*, 387 N.C. 521, 525 (2025) (cleaned up).

Based on our review of opinions from our Supreme Court, as explained below, we conclude the Legislative Cap is not unconstitutional in this case. We so hold because Plaintiff's cause of action against Defendants did not become a vested property right until after the Legislative Cap was enacted in 2011 *and* as our General Assembly generally has the power to determine when a remedy is legally cognizable without impairing the right to a jury trial.

In 1904, in holding that our General Assembly lacked the authority to enact legislation which limited a particular plaintiff's remedy for libel to special damages only, recognized "the right to recover actual or compensatory damages is property[,]" but also that this property right does not vest in the injured party until "the commission of the wrong." *Osburn v. Leach*, 135 N.C. 628, 633 (1904). In this holding, though, the Court did not rely on the right to a jury trial under our state constitution, but rather on a different section in Article I—now codified as Section 18—providing that "every person for an injury done him in his lands, goods, person, or reputation shall have a remedy by due course of law[.]" *Id.* at 631.

In 1983, our Supreme Court recognized our General Assembly's authority under Article I, Section 18 of our state constitution "to define the circumstances under which a remedy is legally cognizable" and can supplant the common law so long as any change does not affect a *vested* property right in a cause of action.

> The "remedy" constitutionally guaranteed "for an injury
> done" is qualified by the words "by due course of law." This
> means that the remedy constitutionally guaranteed must

- 10 -

be one that is legally cognizable. The legislature has the power to define the circumstances under which a remedy is legally cognizable and those under which it is not. The General Assembly is the policy-making agency of our government, and when it elects to legislate in respect to the subject matter of any common law rule, the statute supplants the common law rule and becomes the public policy of the State in respect to that particular matter.

Furthermore, since plaintiff's cause of action had not accrued at the time this legislation was passed, no vested right is involved. No person has a vested right in a continuance of the common or statute law. A right cannot be considered a vested right unless it is something more than such a mere expectancy as may be based upon an anticipated continuance of the present general law. We conclude, therefore, that the statute does not violate Article I, section 18, of our state's constitution.

*Lamb v. Wedgewood S. Corp.*, 308 N.C. 419, 444−45 (1983) (internal marks and citations omitted).

More recently, in 2004, our Supreme Court reiterated that "[v]ested rights of action are property, just as tangible things are property. A right to sue for an injury is a right of action; it is a thing in action, and it is property." *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 176 (2004). In this decision, the Court recognized our General Assembly's authority to enact a cap on *punitive* damages, a type of non-compensatory damage. *Rhyne*, 358 N.C. at 190. In so holding, the Court reiterated that it "gives acts of the General Assembly great deference, [that] a statute will not be declared unconstitutional under our Constitution unless the Constitution clearly prohibits that statute" and that "there is a strong presumption that [a] statute [ ] is

constitutional." *Id.* at 167–68.

The Court in *Rhyne* also reasoned that, though punitive damages hold "an established place in North Carolina common law[,]" our General Assembly has the power to modify or repeal aspects of our common law:

> [I]t is well settled that North Carolina common law may be modified or repealed by the General Assembly, except for any parts of the common law which are incorporated in our Constitution.
>
> The legislative branch of government is without question the policy-making agency of our government, and when it elects to legislate in respect to the subject matter of any common law rule, the statute supplants the common law rule and becomes the public policy of the State in respect to that particular matter. The General Assembly is the "policy-making agency" because it is a far more appropriate forum than the courts for implementing policy-based changes to our laws. This Court has continually acknowledged that, unlike the judiciary, the General Assembly is well equipped to weigh all the factors surrounding a particular problem, balance competing interests, provide an appropriate forum for a full and open debate, and address all of the issues at one time[.] *Included in the General Assembly's preeminent role in modifying the common law on the basis of policy concerns is its power to define the circumstances under which a remedy is legally cognizable and those under which it is not*.

*Id.* at 169–70 (internal marks and citations omitted) (emphasis added).[2]

---

[2] In *Rhyne*, our Supreme Court did differentiate punitive damages and compensable damages, whether economic or non-economic. Specifically, the Court reiterated that a plaintiff's property interest in compensatory damages, whether economic or non-economic, vests upon the commission of the wrong, but that a plaintiff has no vested property interest in a punitive damage award until judgment is entered. 358 N.C. at 177–78.

Of significance in the present case, the Supreme Court in *Rhyne* cited with approval many cases from other jurisdictions holding that a legislature could limit remedies in causes of action.  For instance, the Court cited with approval the cases referenced above from Virginia, West Virginia, Nebraska, Alaska, Idaho, and Utah, noting the holding in a Virginia case was "that a ceiling on medical malpractice damages 'was a proper exercise of legislative power and therefore did not violate the [state constitution]' "). *Id.* at 169 (quoting *Etheridge v. Med. Ctr. Hosps.*, 376 S.E.2d 525, 532 (Va. 1989)).  The Virginia Supreme Court reasoned that

> at the time the Constitution was adopted, the jury's sole function was to resolve disputed facts, that this continues to be a jury's sole function, and that the jury's fact-finding function extends to the assessment of damages. . . . The medical malpractice cap . . . does nothing more than establish the outer limits of a remedy; remedy is a matter of law and not of fact; and a trial court applies the remedy's limitation only after the jury has fulfilled its fact-finding function. Hence, we concluded, the cap does not infringe upon the right to a jury trial.

*Pulliam*, 509 S.E.2d at 312.

Our Supreme Court in *Rhyne* then recognized our General Assembly "has similarly modified other portions of our common law without violating the North Carolina Constitution[,]" including "limit[ing] liability by enacting statutes of repose[.]" *Rhyne,* 358 N.C. at 171.  And in that vein, the Court agreed with the quote from the Nebraska and Idaho cases that, since the legislative branch could enact a statute of repose, it could limit remedies:

> Because it is properly within the power of the legislature to establish statutes of limitations, statutes of repose, create new causes of action, and otherwise modify the common law without violating separation of powers principles, it necessarily follows that *the legislature also has the power to limit remedies available to plaintiffs without violating the separation of powers doctrine.*

*Id.* at 171 (quoting *Gourley*, 663 N.W.2d at 76−77, from Nebraska, and *Kirkland*, 4 P.3d at 1122, from Idaho) (emphasis added).

In 2021, our Court weighed in, specifically in the context of an action seeking compensatory damages alleging nuisance under the Right to Farm Act, stating that our "General Assembly has modified the common law and statutory cause of actions for nuisance claims and relevant defenses. As with many other caps on compensation and remedies enacted in other areas of civil tort law, HB 467 did not impair nor abolish the right to a jury trial." *Rural Empowerment Ass'n for Cmty. Help v. State*, 281 N.C. App. 52, 65 (2021).

And just last year, in 2024, our Supreme Court, recognizing "[w]here there is a right, there is a remedy[,]" held that a plaintiff is not constitutionally entitled to a "complete remedy—that is, the remedy that is necessary to make the plaintiff whole again." *Washington v. Cline*, 385 N.C. 824, 825, 828 (2024).

In sum, guided by the above cases from our Supreme Court and our Court, we conclude the Legislative Cap is constitutional as applied to those malpractice claims based on "wrongs" which did not occur prior to the enactment of the Legislative Cap. In this case, Plaintiff did not have a property right in her claims against Defendants

until 2019, years after the Legislative Cap was enacted, and the Legislature has the power to "define the circumstances under which a remedy is legally cognizable" without impairing the right to a jury trial. *Rural Empowerment*, 281 N.C. App. at 65. Therefore, we conclude the Legislative Cap imposed by the trial court reducing the jury's award did not violate Plaintiff's right to a jury trial.

AFFIRMED.

Judges COLLINS and WOOD concur.